# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**LAURA L. VOLK**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**HENRY A. FLORES, JR.**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

FREDRICK ALLEN LAUX,                    )
                                         )
    Appellant-Petitioner,            )
                                         )
       vs.                          )       No.  27A04-1205-PC-269
                                         )
STATE OF INDIANA,                        )
                                         )
    Appellee-Respondent.             )

APPEAL FROM THE GRANT SUPERIOR COURT 1
The Honorable Jeffrey D. Todd, Judge
Cause No. 27D01-0503-PC-53

**February 20, 2013**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

In this case, the appellant-petitioner, Fredrick Laux, challenges the denial of his petition for post-conviction relief after he was convicted of murdering his wife and receiving a sentence of life without parole (LWOP).  Laux claims that his trial counsel was ineffective for failing to: 1) properly question a juror regarding bias; 2) object to alleged victim impact evidence; and 3) object to instances of prosecutorial misconduct.  Laux also contends that his trial counsel did not adequately prepare for the penalty phase of the trial.  Finally, Laux maintains that his appellate counsel was ineffective for failing to present these alleged errors on direct appeal.

Concluding that Laux has failed to show that he received the ineffective assistance of either trial or appellate counsel, we affirm the denial of Laux's request for post-conviction relief.

## FACTS

As set forth in Laux's direct appeal to our Supreme Court, the facts are as follows:

In June 2001, Heidi Laux separated from her husband Fred Laux, moved with her two daughters from Anderson to Marion, and began divorce proceedings.  Soon thereafter, Laux also relocated to Marion, and moved into a house situated less than one mile from Heidi.  On November 19, 2001, the divorce became final.  On the following Valentine's Day, February 14, 2002, Laux personally delivered a rose and card to Heidi at her place of work.  Heidi gave the rose to a friend, disposed of the card, and told Laux what she did with his offerings.

The next day, Heidi and Laux agreed to attend a dance sponsored by Heidi's employer. Laux had the daughters for weekend visitation and brought them with him to the dance. During the dance, Laux became increasingly suspicious that Heidi was involved with a co-worker. Laux left the dance around 8:00, went home, and played cards with his daughters before going to bed.  Around 3 a.m. the following morning, Laux awoke

2

and decided to "fix" Heidi. He dressed in two pairs of sweatpants, a sweatshirt, gloves, a hat, and a ski mask. He collected a flashlight and a crowbar and ran to Heidi's house.

Upon arrival, Laux used the crowbar to pry open a coal chute and gain entrance to Heidi's house. He entered the basement through the chute and made his way upstairs. Laux proceeded to Heidi's bedroom, struck her three times with the crowbar, strangled her, and left. She died from her injuries within twenty minutes.

The State charged Laux with murder, felony murder, and burglary resulting in bodily injury. It later requested a sentence of life in prison without parole. After a three-day trial, the jury found Laux guilty on all counts and recommended life in prison without parole. The trial court merged Laux's murder and felony murder convictions and sentenced him to life in prison without parole for the murder and a consecutive term of twenty years for the burglary.

Laux v. State, 821 N.E.2d 816, 817-18 (Ind. 2005).

At the penalty phase of the trial, the State called three witnesses, Drs. George Parker and Velma Atkinson, both of whom interviewed Laux following a motion for evaluations for competency, and Detective Stephen Dorsey. The State used the doctors' testimony to recount the facts of Laux's criminal offenses as he had described them during his evaluations. Laux cross-examined the doctors regarding their opinions as to his mental health.

Dr. Parker, a psychiatrist, determined that Laux suffered from "moderately severe major depression" but that the "severe mental disease" did not interfere with Laux's ability to distinguish between right and wrong. Tr. p. 431-32, 435-41. Dr. Atkinson, a psychologist, found no evidence of mental disease but diagnosed Laux with anti-social

3

personality disorder. Dr. Atkinson also noted that, at the time of the offense, Laux was cognizant of distinguishing between right and wrong.

Laux testified and called the following witnesses: his priest, Father Richard Wiesenberger and Cathy Cole, who attended the same church and was one of his daughter's kindergarten teachers. Both witnesses testified about how Laux was a devoted Catholic, father, and husband, and his beliefs about divorce under Catholicism. Laux testified about the details of his actions and thoughts before, during, and after the murder. He also introduced evidence of his lack of criminal history, his employment history, being a graduate of Purdue University, and obtaining a new job to move closer to his children.

At the conclusion of the penalty phase, the jury found beyond a reasonable doubt that Laux murdered Heidi while he was committing burglary. The jury also found that the aggravating factors outweighed any proffered mitigators. As a result, the jury recommended a sentence of LWOP. The trial court ultimately sentenced Laux according to the recommendation of the jury. Laux was also ordered not to contact his children or his wife's family.

On direct appeal, Laux asserted that: 1) that Indiana's death penalty statute was unconstitutional because the jury need not find all elements of the alleged crime; 2) the inclusion of the order precluding him from having contact with his children or the victim's family was improper; 3) his convictions for both murder and felony murder violated double jeopardy principles; 4) his consecutive sentence for burglary after it was

4

the aggravating circumstance for LWOP violated double jeopardy principles; 5) the trial court failed to assign appropriate weight to his lack of criminal history; and 6) his sentence was inappropriate. Laux, 821 N.E.2d at 818-23. In a 3-2 decision, our Supreme Court vacated the no-contact order, but affirmed the trial court in all other respects. Id. at 823.

On May 11, 2011, Laux filed an amended petition for post post-conviction relief,[1] claiming that his trial counsel was ineffective for: 1) failing to properly question a juror to reveal potential bias; 2) failing to object to alleged victim impact evidence/testimony; 3) failing to object to alleged irrelevant and prejudicial evidence; 4) admitting during closing argument that the State had proven its statutory aggravator in the penalty phase allegedly without Laux's consent; 5) failing to adequately prepare and investigate prior to the penalty phase of the trial; 6) admitting evidence of anti-social personality disorder; 7) failing to adequately cross-examine the mental health experts and to provide them with sufficient material to render an accurate diagnosis; 8) failing to object to testimony that did not relate to the statutory aggravator; and 9) failing to object when the trial court informed the jury they may be sequestered at the conclusion of the penalty phase but not because they were in danger.

Laux also maintained that his appellate counsel was ineffective for failing to raise the issues on appeal that his trial counsel did not raise pursuant to the fundamental error doctrine.

---

[1] Laux filed his initial petition for post-conviction relief on March 15, 2005.

5

At the post-conviction hearing, Laux presented testimony from his trial and appellate counsel, a juror, Dr. Parker, Laux's sister, and a former co-worker. Laux's co-worker and sister testified about Laux's positive traits, his childhood, and demeanor throughout the divorce.

The juror testified that she was harassed by a man who requested that she alter his pants. The harassment led to three acts of battery. Although the man believed that they were in a steady relationship, the juror denied this and further testified that the man raped her once but that she did not report it to the police. However, the juror unequivocally testified that she had no pre-conceived notions about Laux and that her verdict was based solely on the evidence presented and not on any prior incident.

Dr. Parker reaffirmed his diagnosis that Laux suffered only from major depression and criticized Dr. Atkinson's opinion that Laux suffered from antisocial disorder. Dr. Atkinson was unable to testify because she had died on November 19, 2004.

Laux's trial counsel testified that this was his first LWOP case and that to prepare, he read material from the Public Defender Council regarding those types of cases. Trial counsel also testified that his preparation for the penalty phase "was essentially similar to preparing for a sentencing hearing in a normal case." Tr. p. 13, 31-32. However, the record demonstrates that prior to trial, Laux's trial counsel initiated proceedings for mental evaluations. Those evaluations were discussed, through testimony, during the penalty phase on cross-examination by counsel. The evidence also established that trial

6

counsel reviewed the physicians' reports prior to the penalty phase and that he spoke to Dr. Atkinson before she talked to Laux and before Dr. Atkinson testified.

Laux's appellate counsel could not remember whether, or how, any alleged victim impact evidence was presented at Laux's trial, and therefore could not recall why he did not present such an argument. Laux's counsel on appeal also could not remember any evidence of non-statutory aggravators that were presented during the penalty phase. However, Laux's appellate counsel was able to discuss the reasons for pursuing the claims that were raised in his brief, including his arguments regarding the inappropriateness of Laux's sentence.

Following a hearing, the post-conviction court issued findings of facts and conclusions of law denying Laux's request for relief. It was determined that neither Laux's trial counsel nor his appellate counsel was ineffective. Laux now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review—Post-Conviction Relief

In reviewing the judgment of a post-conviction court, we consider only the evidence and reasonable inferences that support the judgment. Conner v. State, 711 N.E.2d 1238, 1245 (Ind. 1999). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004). To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion

opposite of that reached by the post-conviction court. Graves v. State, 823 N.E.2d 1193, 1197 (Ind. 2005).

Where, as here, the post-conviction court enters findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule (1)(6), we will reverse only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. Ben–Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000). Only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, will its findings or conclusions be disturbed as being contrary to law. Miller v. State, 702 N.E.2d 1053, 1058 (Ind.1998).

## II. Laux's Claims—Ineffective Assistance of Counsel

Laux claims that the post-conviction court erred in denying his request for relief because he established that both his trial counsel and appellate counsel were ineffective. More particularly, Laux argues that his trial counsel was ineffective for failing to: 1) challenge a juror for cause; 2) object to victim impact evidence; and 3) adequately prepare for, and present, mitigating evidence at the penalty phase. Laux also asserts that his appellate counsel was ineffective for failing to present the same issues on appeal that his trial counsel allegedly neglected to raise.

## A. Standard of Review

We review claims of ineffective assistance of counsel under the two prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Bieghler v. State, 690 N.E.2d

188, 192 (Ind. 1997). The same standard applies to claims of ineffective assistance of both trial and appellate counsel. Id.

To prevail on a claim of ineffective assistance of counsel, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness as determined by prevailing norms, and that the lack of reasonable representation prejudiced him. Randolph v. State, 802 N.E.2d 1008, 1013 (Ind. Ct. App. 2004). To satisfy the first prong, the petitioner must show that counsel's performance was deficient in that counsel's representation fell below an objective standard of reasonableness and that counsel committed errors so serious that petitioner did not have the "counsel" guaranteed by the Sixth Amendment. Reed v. State, 856 N.E.2d 1189, 1195 (Ind. 2006). To establish prejudice, the petitioner must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Pruitt v. State, 903 N.E.2d 899, 906 (Ind. 2009).

Under this standard, judicial scrutiny of counsel's performance must be highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Bieghler, 690 N.E.2d at 192. Counsel is afforded considerable discretion in choosing strategy and tactics and we will accord that decision deference. Randolph, 802 N.E.2d at 1013. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. Id.

9

Ineffective assistance of appellate counsel claims fall into three categories: 1) denial of access to an appeal; 2) waiver of issues; and 3) failure to present issues well. Id. at 193–95. To prevail on a claim regarding appellate counsel's failure to raise an issue, the first prong of the Strickland test requires Laux to show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy. Carter v. State, 929 N.E.2d 1276, 1278 (Ind. 2010). We "consider the totality of an attorney's performance to determine whether the client received constitutionally adequate assistance." Bieghler, 690 N.E.2d at 194.

Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal. Reed, 856 N.E.2d at 1196. One reason for this is that the decision about what issues to raise is one of the most important strategic decisions to be made by appellate counsel. Id.

Finally, we note that the two prongs of the test under Strickland are separate and independent inquiries. Therefore, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we may determine the prejudice prong first without inquiring into whether counsel's performance was adequate. Thacker v. State, 715 N.E.2d 1281, 1284 (Ind. Ct. App. 1999).

### B. Fair and Impartial Juror

Laux contends that his trial counsel was ineffective for failing to adequately question a juror regarding her life experiences that were similar to the charges that had

been brought against him. Laux maintains that had the juror been adequately questioned, she would have been struck from the panel for cause because she had been a victim of rape, assault, and stalking.

We note that Article 1, Section 13 of the Indiana Constitution and the Sixth Amendment to the United States Constitution guarantee a defendant the right to an impartial jury. Taylor v. Louisiana, 419 U.S. 522, 526-28 (1975); Joyner v. State, 736 N.E.2d 232, 238 (Ind. 2000). These constitutional guarantees are satisfied when the jury is capable and willing to decide the case solely on the evidence before it. Leach v. State, 699 N.E.2d 641, 642 (Ind. 1998).

The function of voir dire is to ascertain whether a prospective juror can render a fair and impartial verdict in accordance with the law and the evidence. Zachary v. State, 469 N.E.2d 744, 747 (Ind. 1984). Generally, proof that a juror was biased against the defendant or lied during voir dire entitles a defendant to a new trial. Warner v. State, 773 N.E.2d 239, 246 (Ind. 2002).

In support of his claim, Laux relies primarily on State v. Dye, 784 N.E.2d 469 (Ind. 2003). In Dye:

> Gunn [the juror at issue] twice answered "no" [in her questionnaire], to the question of whether she or any member of her family had ever been a victim of a crime. However, in the post-conviction hearing, she testified that she had been raped by her uncle when she was two or three years old, but that her uncle had not been prosecuted. She also testified that she still thinks about the rape, and, although she did not reveal the crime on her juror questionnaire because she has "tried to forget it," she thought about her experience during the trial.

11

In the present case, while the defendant's convictions did not include rape, evidence was presented at his trial that one of the victims was found laying partially undressed in a position highly suggestive of sexual assault, and a semen-stained washcloth was found near her body. Noting that the State did not charge that the victim was murdered in the course of a sexual assault, the post-conviction court nevertheless found that "a reasonable inference of sexual activity could be drawn from the evidence."

Id. at 474-75.

The juror in Dye also concealed in her juror questionnaire and during voir dire, her and her family's criminal histories and her predisposition to impose the death penalty upon a conviction for intentional murder. Id. Based on the juror's deceit and evidence on the record that she was indeed biased, the post-conviction court found that the juror committed gross misconduct and reversed Dye's convictions on three counts of murder and sentence of death. Our Supreme Court affirmed. Id.

The rationale in Dye does not apply in these circumstances. First, at no point did the juror intentionally deceive the court or the parties as did the juror in Dye. Second, the juror was unequivocal throughout voir dire and at the post-conviction hearing that her past experiences did not affect her ability to render a fair and impartial sentence and verdict. Tr. p. 90, 109. Thus, the post-conviction court properly found that "no credible evidence exist[ed] that [the juror] was . . . biased." Appellant's App. p. 158.

Indeed, the record indicates that the juror was objective and competent. She was open to all arguments and evidence and prepared to follow the law as the trial court would instruct. The questionnaire, voir dire, and the juror's testimony all support this

12

conclusion.  Id. at 53, 90, 101, 109.  The record does not show any valid bases to support a challenge for cause.

Finally, we note that the juror's circumstances were not even superficially similar to that of Heidi's.  The juror was subjected to harassment from a past customer with which she had no domestic relationship.  Tr. p. 53.  Her victimization occurred essentially out of happenstance.

In contrast, Heidi was a victim of her ex-husband.  The complete dissimilarity in the circumstances of the acts, coupled with the juror's unequivocal and non-wavering impartiality, demonstrates her lack of bias and the accompanying lack of prejudice to Laux.

In sum, Laux falls far short of showing that the juror was biased, impliedly or otherwise.  Thus, Laux cannot show that counsel was ineffective with regard to this claim.

### C.  Trial Counsel's Decision Not to Object to Background Witness Testimony

Laux also contends that his trial counsel's decision not to object to alleged victim impact and non-statutory aggravation evidence during the guilt phase of the trial constituted ineffective assistance of counsel.  Laux points to several instances in the State's case-in-chief during the guilt phase where evidence was allegedly admitted improperly and without objection.

First, Laux argues that his trial counsel should have objected to the testimony from the victim's mother that described where Heidi grew up, her education and employment,

13

and where Heidi met and married Laux. While Laux's counsel did object to the introduction of such evidence, the State asserted that it was merely preliminary information and asked the court for leeway. In response, the trial court permitted the State to "briefly finish in [that] area," and overruled the objection. Tr. p. 36. Laux's counsel also objected to the mother's testimony regarding Heidi's religious beliefs, reasons for the victim's trips to see her mother, and her scheduled gall bladder surgery approximately a week before she was murdered. In response, the prosecutor maintained that the victim's physical condition, just days before the murder, was relevant. The trial court overruled that objection as well. Id. at 41.

Second, Laux argues that counsel should have objected to the introduction of a photo of Heidi and their children. Tr. p. 45-47. However, Laux's counsel did object to the introduction of individual photographs of the children as irrelevant and the trial court sustained that objection. Id. at 47.

Third, Laux argues that his trial counsel should have objected to the testimony of Ruthann Curtis, one of Heidi's co-workers, regarding the services provided by their employer, Heidi's position at the company, the activities they engaged in outside of work, and the admission of the last known photograph of Heidi while she was alive that was taken on the night of the murder. Laux's counsel objected not once, but six times, throughout Curtis's testimony raising claims of irrelevancy and hearsay.

14

Fourth, Laux contends that his counsel should have objected to the testimony of Sybil Kay, Heidi's co-worker, regarding her testimony that detailed Heidi's whereabouts immediately after her employer's sponsored dance only hours before she was murdered.

Fifth, Laux contends that counsel should have objected to the testimony of Shawn Fulton, one of Heidi's clients at her place of business, and one of the people she drove home from the dance just hours before her murder. Specifically, Laux argues that counsel should have objected to Fulton's testimony as to how Heidi's employment responsibilities led them to meet and interact with each other.

Sixth, Laux argues that counsel should have objected to the testimony of William Barnes, Heidi's co-worker, the person who found her dead. Specifically, Laux maintains that testimony as to how Barnes and Heidi met and how they interacted with each other and co-workers should not have been admitted into evidence.

Seventh, Laux argues that counsel should have objected to the introduction of a photograph of Heidi's kitchen and a table which showed items that the children had made. The photographs were introduced through Detective Robin Young, who explained the layout of Heidi's house that Laux had broken into in the early morning.

Eighth, Laux asserts that trial counsel should have objected to the State's closing argument in the guilt phase when it stated that Heidi's hands were "only meant to care and give" and during rebuttal in the guilt phase where the State noted that Laux "violated the law and it was against the peace and dignity of the State of Indiana. Against the peace and dignity of Heidi. . . ." Tr. p. 381, 400.

15

Finally, Laux argues that his counsel should have objected to the State's penalty phase closing argument when the State asked, "what is appropriate for Heidi and what she went through?" Id. at 572. Laux also asserts that counsel should have objected to the State's penalty phase rebuttal closing argument where it averred that he was not responsible after he had just offered to the jury testimony about how he was a devoted father.

In resolving the issues that Laux presents, we note that during the penalty phase of an LWOP case, the evidence must be confined to the charged statutory aggravators set forth in Indiana Code section 35-50-2-9. In this case, the aggravator at issue was whether Laux intentionally killed the victim while committing burglary. Appellant's App. p. 32. "[W]hen the death sentence is sought, courts must . . . limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute. The same is true for a sentence of life without parole." Cooper v. State, 854 N.E.2d 831, 840 (Ind. 2006).

Victim impact testimony is not admissible in the sentencing phase of a capital trial if that testimony is irrelevant to the alleged aggravating factor. Bivins v. State, 642 N.E.2d 928 956 (Ind. 1994). Generally, victim impact evidence is evidence that demonstrates the consequences suffered by a victim or a victim's family as a result of a crime. Holmes v. State, 671 N.E.2d 841, 848 (Ind. 1996), reh'g denied, cert. denied, 522 U.S. 849, abrogated on other grounds by Wilkes v. State, 917 N.E.2d 675 (Ind. 2009).

Error in the receipt of victim impact evidence is subject to harmless error analysis. Bivins, 642 N.E.2d at 956-57.

In this case, eight of the nine claims of ineffectiveness revolve around evidence that was introduced during the guilt phase. As noted above, the Bivins restriction precluding evidence of non-statutory aggravation applies to the penalty phase and not the guilt phase.

We agree with the post-conviction court's determination that the evidence cited by Laux was "taken out of context" and "[a]t worst, [it] merely filled in the background for other testimony of a particular witness." Appellant's App. p. 159. The evidence in question revealed background information as to how the witnesses and the victim became acquainted and how they interacted, or it set up a foundation to inform the jury of victim's whereabouts the night of the murder. In short, this is not evidence that "demonstrates the consequences suffered by a victim or a victim's family as a result of a crime." Holmes, 671 N.E.2d at 848.

Also, we cannot say that the evidence was victim impact evidence considered by the jury in non-statutory aggravation. The trial court expressly admonished the jury through its penalty phase instructions that it may only consider the charged statutory aggravator as weighing in favor in LWOP. Thus, we cannot say that trial counsel was ineffective for failing to object to evidence that was never used as Laux contends. Consequently, it was irrelevant that Laux questioned trial counsel regarding his knowledge of LWOP penalty phases and that he probably did not know that victim

17

impact evidence and other non-statutory aggravation evidence were inadmissible in LWOP cases. Tr. p. 31-32.

It is worth noting that Laux's post-conviction counsel ceased the inquiry of trial counsel with that question. More particularly, Laux's post-conviction counsel never asked Laux specific questions regarding each claim Laux now claims on appeal that trial counsel should have objected to as victim impact and/or non-statutory aggravation evidence. Without evidence of Laux's trial counsel's thought process with respect to each claim of error, the presumption of effectiveness must stand. Harrington, supra. Simply put, Laux has failed to sustain his burden.

Also, with regard to the penalty phase, we note that the State properly moved to have all the evidence from the guilt phase admitted at the penalty phase, as Indiana Code section 35-50-2-9(d) permits. However, the jury was properly instructed that it could only consider the charged aggravator as weighing in favor of an LWOP sentence. Tr. p. 479.

The jury is presumed to follow the trial court's instructions and not law recited by counsel during arguments. See Chandler v, State, 581 N.E.2d 1233, 1237 (Ind. 1991) (observing that it is presumed that a jury will obey a trial court's instructions); Hudgins v. State, 451 N.E.2d 1087, 1091 (Ind. 1983) (holding that "[a]ny misstatements of law during closing argument are presumed cured by final instruction"). Thus, contrary to Laux's assertion, the entirety of the evidence to which his counsel chose not to object was not before the jury during the penalty phase. Put another way, non-statutory aggravation

18

evidence and victim impact evidence was not before the jury because the trial court gave an instruction which admonished the jury from considering such evidence. As a result, Laux has failed to demonstrate that his counsel was deficient with respect to these claims or how he suffered prejudice. Thus, Laux's contentions of ineffective assistance of trial counsel fails on this basis.

### D. Not Objecting to Alleged Prosecutorial Misconduct

Laux next contends that his trial counsel was ineffective because the deputy prosecutor repeatedly offered inadmissible evidence throughout the trial. Laux argues that he was placed in a position of grave peril by the deputy prosecutor's improper introduction of extensive evidence about the victim during trial. Appellant's Br. p. 31.

In resolving this issue, we note that to prevail on an ineffective assistance of counsel claim because of prosecutorial misconduct, a post-conviction relief petitioner must first establish that prosecutorial misconduct in fact occurred. Pruitt v. State, 903 N.E.2d 899, 928 (Ind. 2009). When reviewing a properly preserved claim of prosecutorial misconduct, it must be determined 1) whether the prosecutor engaged in misconduct, and if so, 2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. Baer v. State, 866 N.E.2d 752, 756 (Ind. 2007). Whether a prosecutor's actions constitute misconduct is measured by reference to case law and the Rules of Professional Conduct. Cooper, 854 N.E.2d at 835. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the

19

degree of impropriety of the conduct. Baer, 866 N.E.2d at 756. With regard to the penalty phase, we inquire whether the prosecutor has sought the penalty on some basis other than that the mitigating factors are outweighed by the aggravating factors. Cooper, 854 N.E.2d at 841.

In this case, we agree that the post-conviction court correctly found that "the allegations made by the Petitioner claiming the prosecutor committed misconduct are, at best, meritless. The Petitioner cites to no authority that any evidence introduced or arguments made by the prosecutor constituted misconduct. None of the prosecutor's conduct referred to by Petitioner 'infected the trial with unfairness.'" Appellant's App. p. 159-60.

Again, the evidence to which Laux directs us was never utilized as victim impact evidence or a non-statutory aggravator. After the State properly moved for its inclusion in the penalty phase, the trial court expressly admonished the jury through its penalty phase instructions that it may only consider the charged statutory aggravator as weighing in favor of LWOP. Appellant's App. p. 118, 138. Thus, contrary to Laux's assertion, the entirety of the evidence presented by the prosecution in the guilt phase was not before the jury during the penalty phase. That said, Laux has failed to demonstrate either that his counsel was deficient for choosing not to raise a claim of alleged prosecutorial misconduct that had no merit or how he was prejudiced by that choice.

### E. Trial Counsel's Preparation and Presentation for Penalty Phase

Laux contends that his counsel was ineffective for failing to: 1) conduct an adequate investigation into Laux's background and behavior; 2) provide the court-appointed experts with adequate information; 3), present all readily-available mitigating evidence; and 4) rebut inaccurate mental health testimony. Laux contends that had defense counsel presented all of the mitigating evidence to the jury and rebutted the inaccurate evidence it received, there is a reasonable probability the jury would not have recommended a sentence of LWOP.

> In resolving this issue, we note that our Supreme Court has determined:
>
> [F]ailure to investigate and present mitigating evidence could constitute ineffective assistance of counsel, warranting the vacation of a death sentence. That is not to say that counsel is required to present all available mitigation evidence. Counsel may make strategic judgments not to present certain types of mitigating evidence. Timberlake v. State, 690 N.E.2d 243, 261 (Ind. 1997) ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase."). However, the strategic choice not to present mitigating evidence made after less than complete investigation may give rise to an ineffective assistance of counsel claim for failure to investigate.

Ritchie v. State, 875 N.E.2d 706, 719 (Ind. 2007). However, "[w]ith the benefit of hindsight, a defendant can always point to some rock left unturned to argue counsel should have investigated further." Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial." Id.

While Laux's trial counsel acknowledged at the post-conviction hearing that this was his first LWOP case and that he prepared for the penalty phase in an "essentially similar" manner to any other sentencing hearing, his testimony and the circumstances of the case demonstrate that he made important inquires and decisions about the penalty phase at the outset of the case and presented an objectively reasonable case. Tr. p. 13. "Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." Wentz v. State, 766 N.E.2d 351, 361 (Ind. Ct. App. 2002).

Prior to the penalty phase, Laux's trial counsel reviewed LWOP materials prepared by the Public Defender Council. And during the penalty phase, Laux's trial counsel called two lay character witnesses, in addition to Laux, to discuss Laux's lack of criminal history, his mental instability shortly before the murder, and his traits as a devoted father, Catholic, and husband, in an effort to gain sympathy from the jury. Tr. p. 479-562. Although Laux's trial counsel could not remember his precise thought process at the post-conviction hearing, he recalled reviewing the reports of Drs. Parker and Atkinson, speaking with Dr. Atkinson before her testimony prior to sentencing to determine whether their examinations would prove useful. Id. at 14-15. He thoroughly cross-examined both doctors as to their diagnoses of Laux. Tr. p. 20-21. Thus, Laux's trial counsel presented a penalty phase case in which the jury saw a defendant who was emotionally drained from a divorce with the woman he still loved, accepted responsibility for his actions, was suffering from mental defects, had an acute momentary lapse of

22

reason, genuinely regretted his actions, had no prior criminal history, was educated, had a strong work ethic, and had been a devoted father, Catholic, and husband. Id. at 479-562. As the post-conviction court found, trial counsel's approach in this matter was not deficient. Appellant's App. p. 160.

Nevertheless, Laux contends that his trial counsel's failure to present certain evidence during the penalty phase prejudiced him. At the post-conviction hearing, Laux's counsel called two lay character witnesses and Dr. Parker. Tr. p. 76, 82, 102. This testimony involved Laux's work habits while at one job, and his difficult childhood. Id. at 76-81, 82-101. Laux contends that the absence of lay testimony recounting his difficult childhood was prejudicial and constituted deficient performance. Appellant's Br. p. 35-36.

First, the evidence presented through Laux's sister was not mitigating. In Ritchie 875 N.E.2d at 725, our Supreme Court noted that it has consistently held that evidence of a difficult childhood warrants little, if any, mitigating weight. Here, the evidence of Laux's childhood and background fail to show so much as significant hardship. Laux's sister testified that Laux's father was an alcoholic but quit drinking at some point, and that "money was real tight" when they were young, yet they always had food on the table. Tr. p. 89, 91. Laux's mother was diagnosed with paranoid schizophrenia later in life, which Laux disclosed to Dr. Parker when he interviewed him before trial. Id. at 94, 118. However, there is no evidence that Laux was ever a victim of abuse or neglect and despite his "difficult childhood," he was never in trouble, excelled in both high school

23

and college, and secured consistent employment where he performed his duties satisfactorily. Id. at 78-80, 83, 94, 98-101. In our view, such family anecdotes have little, if any, mitigating value.

We also note that trial counsel's testimony that he was unable to remember certain aspects of the case in preparing for the penalty phase is less significant than what the record shows as to how he presented the penalty phase case. Recently, the Supreme Court of the United States has reiterated that trial counsel does not need to expressly state or recall his own strategic motivations for decisions in post-judgment testimony:

> Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, [Wiggins v. Smith, 539 U.S. 510, 526-27, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)], neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

Harrington, 131 S.Ct. at 790. Trial counsel's focus on Laux's mental health, devotion to his faith, and children was a reasonable tactic to employ considering the de minimis value of the proffered childhood testimony. Accordingly, trial counsel was not deficient nor was Laux prejudiced due to the absence of childhood evidence of little, if any, value.

24

## 1. Providing Necessary Information to Experts

In a related issue with respect to his trial counsel's preparation, Laux argues that because his counsel did not interview Laux's sister and co-worker, he could not provide the necessary background information to the mental health professionals. As a result, Laux argues that he is entitled to post-conviction relief on this basis.

In support of this contention, Laux relies on Prowell v. State, 741 N.E.2d 704 (Ind. 2001). In Prowell, the circumstances demonstrated that the defendant's trial counsel, in a capital case, waited after the defendant pleaded guilty, three weeks after the date of the original sentencing hearing, and three weeks before the postponed sentencing hearing before seeking a mental health expert. Because of the time constraints brought on by counsel's procrastination, the expert was unable to properly interview the defendant under normal conditions or at any length. Id. at 711. It was further established that the expert could not establish a relationship necessary to elicit information or collect the full range of records and information from collateral sources necessary for a proper diagnosis. Id. Our Supreme Court held, among other things, that trial counsel was ineffective because of the inaction in securing a mental health expert in a timely manner.

Unlike the circumstances in Prowell, over three months before trial, Laux's trial counsel moved the trial court to appoint two to three board certified experts to evaluate Laux in anticipation of possible defenses and his competency. Contrary to Laux's assertion, a review of Dr. Atkinson's evaluation reveals that she was aware of essentially all of what Laux's sister testified to at the post-conviction hearing. Dr. Atkinson was

25

aware that Laux's father was an alcoholic, that the finances of the family were strained, and that his mother was a paranoid schizophrenic. She was also aware of Laux's educational success, his employment history, his close relationship with his siblings, his hobbies, health, including a previous diagnosis of bipolar disorder, and his marriage history. Appellant's App. p. 159-70. Moreover, Dr. Parker's evaluation reflects the same childhood background and work ethic that Laux claims was not before the experts. Dr. Parker's evaluation recited Laux's work ethic, his success in school, his father's alcoholism, the poor financial condition of the family, Laux's challenging childhood, his mother's paranoid schizophrenia diagnosis in addition to an aunt with the same diagnosis, his relationship history, plus additional background information. Id. at 171-78. Dr. Parker also testified that he was satisfied with his time with Laux to render a diagnosis. Tr. p. 118. These evaluations lasted three hours and two hours, respectively, and were properly conducted as clinical examinations. Id. at 159, 171, 452. The record demonstrates that the experts possessed the information Laux claims was excluded by counsel. Accordingly, the rationale set forth in Prowell is inapplicable. As properly found by the post-conviction court, Laux cannot prevail on his ineffective assistance of counsel argument on this basis.

## 2. Anti-Social Personality Diagnosis

Laux next contends that his trial counsel was ineffective for failing to challenge Dr. Atkinson's opinion that Laux's personality disorder rendered him deceitful, manipulative, and narcissistic. Laux contends that because there was credible evidence

26

that this diagnosis was not accurate, these traits should have been challenged, and trial counsel was ineffective for failing to do so.

It was not until post-conviction, nine years after Laux's conviction, that Dr. Parker criticized the late Dr. Atkinson's diagnosis, which she was unable to defend because of her untimely death. Tr. p. 101, 104-26. Dr. Parker testified that one cannot diagnose antisocial personality disorder without a history of conduct disorder as a juvenile. Id. at 107. Conduct disorder, according to Dr. Parker, would include evidence of a pervasive pattern of lying, cheating, and manipulating.

In sum, Dr. Parker simply does not agree with Dr. Atkinson's diagnosis. It is also important to note that Dr. Atkinson stated that she was suspicious that Laux might have been malingering. Appellant's App. p. 166. Dr. Parker did not take that concern into account. Dr. Atkinson's report was also as thorough as her testimony. Tr. p. 363-414.

It was ultimately up to the jury to decide which, if any, expert to believe, because the fact finder is entitled to weigh and determine the credibility of the expert's opinion based on the evidence presented, including the extent of the witness's experience and expertise, the reliability of the analytical methods employed, and the degree of certitude with which the opinion is cast. Strong v. State, 538 N.E.2d 924, 931 (Ind. 1989). The finder of fact may also supplant its own conclusion for that of the expert. Id.

Both doctors opined that despite their diagnoses, Laux was competent at all times and responsible for his actions. It is therefore unclear how any of the doctors' testimony, whatever diagnosis was found, would have reduced Laux's culpability or benefited him

27

in any way. In any event, Laux's claim that it was error for trial counsel to ask Dr. Atkinson on cross-examination what her findings were because she had found that Laux suffered from an anti-social personality disorder is unavailing.

Trial counsel's pursuit of mental health evidence to support his mitigation was sound strategy. In essence, trial counsel had three options: 1) question neither expert and leave the jury with the belief that Laux was mentally stable and murdered Heidi just because he was angry; 2) question Dr. Parker and provide the jury with just one diagnosis; or 3) question both doctors and provide, not one, but two diagnoses to further persuade the jury that it was his mental instability that caused him to murder Heidi and, therefore, that he was deserving of mitigation. In our view, trial counsel chose the third option, which was the most reasonable under the circumstances. Laux's contention to the contrary is unsupported and without merit.

In sum, we conclude that Laux was provided effective representation of counsel at the penalty phase. Moreover, Laux merely restates his claims about the ineffectiveness of trial counsel and alleges that appellate counsel was ineffective for not raising the issues on appeal under the doctrine fundamental error. Appellant's Br. p. 42-45. As the post-conviction court properly found, because trial counsel was not deficient and/or that any deficiency was not prejudicial, appellate counsel was not deficient for failing to raise Laux's alleged claims of error on appeal. In other words, Laux does not demonstrate how the result of his direct appeal would have been different had these issues been raised. See Strickland, 466 U.S. at 694. Therefore, it cannot be said that Laux's appellate

28

counsel was ineffective. As a result, the post-conviction court properly denied Laux's request for relief.

The judgment of the post-conviction court is affirmed.

RILEY, J., and BARNES, J., concur.