## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 27 2017, 10:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Stephen T. Owens<br>Public Defender of Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
| Jessica Ulm<br>Deputy Public Defender<br>Indianapolis, IN | Larry D. Allen<br>Deputy Attorney General<br>Indianapolis, IN |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dabian D. Boyd,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | September 27, 2017<br><br>Court of Appeals Case No.<br>71A03-1702-PC-357<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable Jeffrey L. Sanford,<br>Judge<br><br>Trial Court Cause No.<br>71D03-1403-PC-15 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Dabian Boyd appeals the denial of his petition for post-conviction relief on two counts of murder. We affirm.

# Facts and Procedural History

[2] On the night of May 5, 2012, a woman saw Kalyn Farmer staggering down a street in South Bend. Farmer asked her for help, telling her that he had been shot. Farmer had been shot three times in the back, "with one bullet entering his lower back to the right and lodging into his spine, another traversing through his upper right arm and through his right forearm, and the third entering in the lower right portion of the back, and travelling through the abdominal cavity, liver, and right lung." *Boyd v. State*, No. 71A04-1304-CR-174, slip op. at 2 (Ind. Ct. App. Dec. 10, 2013). Farmer was taken to a hospital, where he later died from his injuries. The South Bend Police Department was notified of the shooting, but officers were unable to get a statement from Farmer before he died.

[3] On the same night, Cheryl Holt, who is Boyd's cousin, was sitting on the front porch of their grandmother's house after attending a party that was hosted by their uncle. Boyd approached the house, asked Holt if she had seen all the police cars in the neighborhood, and stated that he had a warrant out for his arrest and needed to leave the area. Boyd then went inside the house. Holt had

not seen any police cars up to that point but saw multiple officers patrolling the neighborhood just after Boyd arrived at the house.

[4] After being notified about Farmer's shooting, the South Bend Police Department began searching for the scene of the shooting but were unsuccessful. The next morning, Officer Ken Ryan located a car parked oddly in an alley. He noticed that the driver's side window was shattered and had a bullet hold through the safety glass. Inside the car, he found a second victim, Mercedes Newbill; Newbill and Boyd were also cousins. Newbill was dead with a gunshot wound to his head. Newbill and Farmer had been together the night of the shooting.

[5] Crime-scene technicians were called to the scene to process the car.

> Crime scene technicians arrived at the scene and took pictures of Newbill and the car, and searched for fingerprints and DNA evidence. . . . The technicians noticed that the driver's side window was shattered, and it was evident that the source of the shot was inside the car. The technicians were unable to find any shell casings at the scene, which led them to believe they might be looking for a revolver as the murder weapon. They were able to find a bullet lodged in the driver's side door that was fired from the rear passenger seat, and had narrowly missed Newbill's chest before going through the armrest of the door and getting stuck inside. Another shot passed through the front passenger seat belt. Based upon Farmer's injuries, the technicians believed that one of the wounds to Farmer's lower back could have occurred as a result of being shot while exiting the car. The wound to Farmer's upper back likely did not occur inside the car, but after Farmer had already exited the car.

> Crime scene experts were successful in lifting twenty-two latent prints from the exterior of the car on the side where the murders took place. Out of those prints, some were matched to three individuals. Newbill's fingerprints were found around the outside of the driver's side door, and Rashondra Blake's fingerprints were found just under the window of the front passenger side door. Rashondra Blake is [Michele] Brown's sister.[1] **The third set of prints belonged to Boyd and those fingerprints were found exclusively on the outside of the rear passenger side door. Investigators determined that the shooter was sitting in the rear passenger seat.**

*Id.* at 5-6 (emphasis added).

[6] One month later, Boyd was arrested on an unrelated charge, and police questioned him about the murders. He told officers that on the night of the murders he was at his uncle's party and when he left the party he went to his grandmother's house where he ran into Holt. Boyd claimed that he had not seen Newbill in weeks. Boyd also denied ever seeing, let alone being near, the car where Newbill died, despite being shown fingerprint evidence placing him at the car.

[7] Before Boyd was charged with the murders of Farmer and Newbill, Jermon Gavin approached detectives with information about Boyd.

> Gavin described his relationship with Boyd as very close, "like brothers." [Trial] Tr. at 228. Gavin stated that while he and Boyd shared the same pod, or section, of the jail, Boyd had made

---

[1] Michele Brown was the owner of the car. She routinely let Newbill borrow it.

some statements about the murder of Newbill and Farmer. Gavin indicated that Boyd seemed very cocky about the murders and told him that other people did not understand what it was "like to wake up every day with a body" on their conscience. *Id.* at 231. Gavin further provided officers with details about Boyd's police interrogation including the fact that they had served him Barnaby's pizza during the interrogation, an uncommon occurrence known only by Boyd and the officers.

Gavin also told the officers that Boyd believed Newbill had been shot in the head and the chest, and that five shots had been fired. Although police officers had released information that Newbill had been shot in the head, none of the other information, such as that a gunshot had appeared to have been fired in the direction of Newbill's chest, was released to the public. Because Gavin was in jail at the time of the murders, he could not have been suspected of committing the murder.

Boyd admitted to Gavin that he, Newbill, and Farmer planned to commit a robbery that evening at a house on Laurel Street and Jefferson Boulevard. Farmer had brought along his .38 special revolver, and gave it to Boyd before they went to case the house they intended to rob. They parked the car down the road on Laurel Street, but returned to the car after casing the house. On the way back to the car and out of Farmer's earshot, Boyd and Newbill argued about whether Boyd could just take the gun from Farmer. Newbill told Boyd that if he were to "get into it" with Farmer, Boyd would have a problem with Newbill, too. [*Id.*] at 232.

When the three men returned to the car, Newbill was in the driver's seat, Farmer was in the front passenger seat, and Boyd was in the rear passenger seat behind Farmer. An argument ensued after which Newbill grabbed the "do-rag" off of Boyd's head. [*Id.*] at 233. Boyd shot Newbill in the head and fired another shot toward Newbill's chest. Newbill died almost

immediately as a result of the gunshot wound to his head. Farmer got out of the car and attempted to escape. Boyd shot Farmer three times until the gun clicked. Farmer then fell to the ground, but did not immediately die from his injuries. Boyd then ran back to his house stating that the police were "everywhere." [*Id*.] at 234. Boyd then told Gavin that he sold the gun to Javon Thomas ("Thomas").

*Id.* at 6-8. Boyd was charged with two counts of murder.

[8] During Boyd's jury trial, the State called Gavin to testify. Gavin's testimony was similar to the statement he had given police before the trial. An officer confirmed that Boyd was given Barnaby's pizza during his interview and that this was the only investigation where that had occurred. Thomas also testified that he bought a revolver from Boyd a few days after May 5. Thomas stated that after he was arrested he told his mother to get rid of the gun. The gun was later found in Robert James's possession during a routine traffic stop.

[9] During Gavin's testimony, the State introduced a letter from the deputy prosecutor to Gavin's attorney regarding the terms of Gavin's plea deal in exchange for his truthful testimony against Boyd. The letter included the following statement: "Investigators and I have found Mr. Gavin's statement to be accurate and trustworthy." Ex. 40. Defense counsel objected to the admission of the letter, arguing that the statement was vouching, but the objection was overruled. Defense counsel did not request that the statement be redacted, and the full letter was published to the jury.

[10]     Holt also testified on behalf of the State. She said that Boyd approached her grandmother's house from the opposite direction of her uncle's party—the direction where Newbill and Farmer were shot. Months earlier, police had questioned Holt about the night of the murders. At that time, Holt told officers that she did not remember what direction Boyd approached the house. Defense counsel did not question Holt about her prior inconsistent statement. Rather, counsel reemphasized her direct-examination testimony that she did not go inside at her uncle's party (implying that she did not know if Boyd was at the party) and that she could not remember what time Boyd arrived at her grandmother's house.

[11]     The jury found Boyd guilty of both murders. Boyd, represented by his trial attorney, filed a direct appeal challenging the sufficiency of the evidence against him. This Court found that there was sufficient evidence to support the convictions. *See Boyd*, No. 71A04-1304-CR-174. Boyd then filed a petition for post-conviction relief, arguing that his attorney was ineffective for failing to impeach Holt, for failing to request that the language vouching for Gavin's truthfulness be redacted from the letter, and for failing to raise the vouching issue on direct appeal.

[12]     Boyd's attorney testified at the fact-finding hearing that he remembered Holt being very unsure of her answers. "What I recall about her testimony is something that may not be reflected in the black and white transcript. What I recall about her testimony is that she was very hesitant about a lot of her answers. She went back and forth." P-C Tr. p. 11. He went on to say, "A lot

of times I get people who change their stories, can't remember things. You know, I have to make a judgment call when I see the person actually testify in court as to whether or not they're a believable witness[.]" *Id*. at 12.

[13] Regarding the deputy prosecutor's letter that vouched for Gavin, the attorney stated that he could not remember why he did not ask for the vouching statement to be redacted. The attorney admitted that he could have raised both the sufficiency and vouching claims on direct appeal, but he chose to raise only the sufficiency argument because he "didn't think [vouching] was a very good issue." *Id.* The post-conviction court denied Boyd's petition.

[14] Boyd now appeals.

# Discussion and Decision

[15] Boyd contends that the post-conviction court erred when it denied his petition. Post-conviction proceedings are available to defendants who have exhausted the direct-appeal process and wish to challenge the correctness of their convictions and sentences. *Saylor v. State*, 55 N.E.3d 354, 359 (Ind. Ct. App. 2016), *trans. denied*. Post-conviction procedures are not an opportunity for a "super appeal," and not all issues are available to the petitioner. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001), *cert. denied*. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Ind. Post-Conviction Rule 1(1); *Timberlake*, 753 N.E.2d at 597. In post-conviction proceedings, claims that "something went

awry at trial are cognizable only when they show deprivation of the right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal." *Timberlake*, 753 N.E.2d at 597.

Post-conviction proceedings are civil in nature, and the petitioner has the burden of proving his claims by a preponderance of the evidence. *Saylor*, 55 N.E.3d at 359. In this case, the post-conviction court entered findings of fact and conclusions in accordance with Indiana Post-Conviction Rule 1(6). The post-conviction court's legal conclusions are reviewed de novo, but we accept the factual findings unless they are clearly erroneous. *Id.* "The petitioner must establish that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Id.*

Boyd contends that his attorney was ineffective in three respects: failing to impeach Holt during the jury trial, failing to request that the vouching language be redacted from the State's letter to Gavin's counsel, and failing to challenge the admission of the letter on direct appeal, despite preserving the issue for appeal.

To prevail on a claim of ineffective assistance of counsel, the petitioner must demonstrate both "that his counsel's performance was deficient and that he was prejudiced thereby." *Trujillo v. State*, 962 N.E.2d 110, 114 (Ind. Ct. App. 2011); *see also Strickland v. Washington*, 466 U.S. 668, 688 (1984). These two elements are separate and independent inquiries. *Id.* Thus, the failure to satisfy either

will cause the ineffective-assistance-of-counsel claim to fail. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). We first turn to the deficient-performance prong.

# I. Deficient Performance

Counsel's performance was deficient if "it fell below an objective standard of reasonableness based on prevailing professional norms." *Trujillo*, 962 N.E.2d at 114. "[J]udicial scrutiny of counsel's performance must be highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Laux v. State*, 985 N.E.2d 739, 745-46 (Ind. Ct. App. 2013). We give great deference to counsel's performance and strategic decisions, and "[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." *Id.*

## A. Holt's Testimony

Boyd argues that the post-conviction court erred when it denied his claim that his attorney was ineffective for failing to impeach Holt with her prior-inconsistent statement. One month after the murders, Holt was questioned by police and told officers that she did not remember the direction from which Boyd had approached her grandmother's house on the night of May 5. At trial, when questioned by the State, Holt testified that Boyd approached the house from the opposite direction of her uncle's party—in other words, Boyd approached the house from the direction where Farmer and Newbill were shot. On cross-examination, Boyd's attorney did not confront Holt with the earlier

statement she had given to police. Instead, the attorney reemphasized Holt's direct-examination testimony that she had not gone inside at her uncle's party, implying that she could not verify if Boyd was there. He also emphasized that Holt was unsure of what time specific events took place that night, including what time Boyd arrived at her grandmother's house.

[21] Appellate courts will not "lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 43 (Ind. 1998).

[22] When questioned about the failure to impeach Holt with her prior statement, Boyd's attorney could not remember his specific trial strategy on this point. However, he did state that Holt was not coming across as a credible witness because she was "very hesitant about a lot of her answers." P-C Tr. p. 11. He also stated that during trial he makes "a judgment call" as to whether a witness is coming across to the jury as believable. *Id.* at 12. The post-conviction court concluded that the attorney's performance was not deficient.

[23] We disagree with the post-conviction court and find that the decision to let Holt's answers stand as is because she was not coming across as credible was not a reasonable trial strategy in this case. Boyd's attorney failed to state a strategic reason for the failure, the State has not suggested one, and we cannot think of one. Pointing out that Holt's story had changed over time would have further established her lack of credibility. Accordingly, the performance of

Boyd's attorney fell below an objective standard of reasonableness and was deficient in this respect.

## B. Vouching Statement

[24] Boyd's second argument is that the post-conviction court erred when it denied his claim for ineffective assistance of counsel when his attorney failed to request that the vouching statement be redacted from the letter. The challenged statement reads, "Investigators and I have found Mr. Gavin's statement to be accurate and trustworthy."[2] Ex. 40. Boyd contends that his attorney's strategy was to keep the vouching statement out of evidence when he objected to the letter's admission as an exhibit; however, the attorney "pursued this strategy ineffectively" by not requesting the statement be redacted after the trial court overruled the objection. Appellant's Br. p. 23. At trial, a lawyer shall not ". . . state a personal opinion as to the justness of a cause, **the credibility of a witness**, the culpability of a civil litigant or the guilt or innocence of an accused[.]" Ind. Professional Conduct Rule 3.4(e) (emphasis added). "It is

---

[2] Boyd notes that the post-conviction court omitted "the key vouching statement" in its conclusions. Appellant's Br. p. 19. While Boyd is correct that the court did not quote the challenged language in its conclusion, the court did include it in finding of fact 61. *See* Appellant's P-C App. p. 103. And the court concluded that the letter included a vouching statement. Accordingly, we conclude that the court was aware of the challenged language when it made its conclusions and that the omission in its conclusions did not impact its decision to deny Boyd's petition.

Furthermore, Boyd's brief also asserts that the next sentence in the letter constitutes vouching: "Again, I expect Mr. Gavin's testimony at trial will be very helpful to the State." Appellant's Reply Br. p. 5; Ex. 40. We fail to see how this was vouching. If anything, the statement was potentially more harmful to the State than to Boyd. The deputy prosecutor clearly stated that Gavin's testimony "will be very helpful **to the State**," not to the jury, not for the search for the truth, but for the State. This allowed the jury to question whether Gavin was merely saying what the State wanted to hear in exchange for a plea deal, or if Gavin was in fact telling the truth.

furthermore inappropriate for the prosecutor to make an argument which takes the form of personally vouching for a witness." *Lainhart v. State*, 916 N.E.2d 924, 938 (Ind. Ct. App. 2009) (citing *Schlomer v. State*, 580 N.E.2d 950, 957 (Ind. 1991)).

[25] In its order, the post-conviction court stated, "This Court doesn't understand why this exhibit was offered or why the Court allowed it to be admitted into evidence because it is a vouching statement." Appellant's P-C App. p. 122. We agree with Boyd and the post-conviction court: this language is vouching. The deputy prosecutor gives his personal opinion about Gavin's credibility, pointing out that earlier statements Gavin gave were "accurate and trustworthy." However, the post-conviction court concluded that the attorney's failure to request a redaction was not ineffective assistance of counsel, stating, "It seems to have been a tactical decision made during the course of the trial by [the attorney] and is entitled to deferential treatment." *Id.* The court went on to conclude that at its worst, this decision was a bad strategy or tactic that did not amount to ineffective assistance.

[26] We disagree with the court's conclusion that this was a reasonable tactical decision. Boyd's attorney recognized the vouching language contained in the letter because he objected to the letter's admission. However, after being overruled, he failed to request that the vouching statement be redacted, and during the post-conviction hearing he was unable to articulate any strategic reason for this failure. Accordingly, we find that Boyd's attorney's performance on this issue was deficient.

# C. Direct Appeal

Boyd's final argument is that the post-conviction court should have found that his attorney was ineffective for failing to raise the vouching issue on direct appeal. He contends that the issue was "a significant and obvious appellate issue" that was stronger than the one issue that was raised: insufficient evidence. Appellant's Br. pp. 13-14. These claims are reviewed using the same standard as ineffectiveness of trial counsel. *Taylor*, 717 N.E.2d at 94 (Ind. 1999).

Claims of ineffective assistance of appellate counsel must fall into one of three categories: 1) denying access to an appeal; 2) waiver of issues; and 3) failing to present issues well. *Bieghler v. State*, 690 N.E.2d 188, 193-95 (Ind. 1997). Boyd's argument falls into the second category. When reviewing a waiver-of-issue claim, the petitioner must "show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy." *Timberlake*, 753 N.E.2d at 606. "Ineffectiveness is rarely found when the issue is failure to raise a claim on direct appeal." *Taylor*, 717 N.E.2d at 94. That is because "[t]he decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Id*. We will give considerable deference to appellate counsel's strategic decisions and "will not find deficient performance in appellate counsel's choice of some issues over others when the choice was

reasonable in light of the facts of the case and the precedent available to counsel at the time the decision was made." *Id.*

[29] Boyd contends that the vouching claim had a reasonable probability of succeeding on appeal whereas his insufficient-evidence argument did not. The post-conviction court did not directly address whether the attorney's performance was deficient; it did, however, conclude that the decision not to raise the admission of the letter on direct appeal was not ineffective assistance. We conclude that Boyd's attorney's performance was deficient. The attorney properly preserved the admission of the letter for appeal, and this was a significant and obvious issue to raise on appeal. When asked why he did not raise the issue on direct appeal, the attorney simply stated that he "didn't think it was a very good issue." P-C Tr. p. 14. While we give considerable deference to appellate counsel's decision regarding which arguments to raise, this answer does not persuade us that the decision was strategic. Accordingly, we conclude that the attorney's representation on direct appeal was deficient.

## II. Prejudice

[30] The second prong of the *Strickland* test requires the petitioner to show that counsel's deficient performance prejudiced him. To prove prejudice, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Trujillo*, 962 N.E.2d at 114.

[31]   While we agree with Boyd that his attorney was deficient on all of the issues raised, we disagree with his contention that his attorney's actions prejudiced him. Looking at the totality of the evidence presented, we cannot say that there is a reasonable probability that the outcome of Boyd's trial or direct appeal would have been different.

[32]   The jury was presented with physical evidence—Boyd's fingerprints that were found on the outside of the rear passenger door of the car where Newbill's body was found. Crime-scene investigators determined that the shooter was sitting in the rear passenger seat. Moreover, the jury heard Boyd tell officers that Newbill was shot in the head and chest. "Somebody else said [Newbill] tried to commit suicide, but I said, 'How can you commit suicide if you get shot in the chest and the head?'" Ex. 35 at 43:22. Officers asked Boyd to clarify where Newbill had been shot, and Boyd again stated that Newbill was shot in the chest and the head. When asked how Boyd knew Newbill was shot in the chest, Boyd stated that a family member was told by an investigator where Newbill had been shot and that the family member had then told Boyd the information. The officers responded, "We don't release where they're shot." *Id.* at 44:17. Officers never publicly released any information about the shot aimed at Newbill's chest.

[33]   Regarding Gavin's testimony, even without the letter, the jury was inclined to believe Gavin because of multiple instances that bolstered his credibility. Gavin testified that, while housed in the same area of the jail, Boyd confessed to him about the murders and provided details about the murders that only the shooter would have known—two shots were fired at Newbill, one at his head and one

at his chest. Gavin also stated that Boyd used a .38 revolver that was later sold to Thomas. Thomas corroborated this statement, telling the court that a few days after May 5 he bought a revolver from Boyd.[3] Other details that Gavin provided officers related to the conditions under which Boyd was interviewed—officers gave Boyd Barnaby's pizza and soda. These details bolstered Gavin's credibility because it was the first time that officers had ever given Barnaby's pizza to someone in an interview room. *See* Trial Tr. p. 299. Given the physical evidence against Boyd, his admission to knowing about the shot fired at Newbill's chest, and the additional evidence to support Gavin's testimony, we conclude that Boyd was not prejudiced by his attorney's deficient performance. Accordingly, Boyd did not receive ineffective assistance of counsel at trial or on direct appeal.

[34]    Affirmed.

Bailey, J., concurs.

Robb, J., concurs in result with opinion.

---

[3] Officer Brandon Stec testified that he recovered the murder weapon from a man named Robert James during a routine traffic stop. In its findings of fact, the post-conviction court incorrectly states, "James told investigators that he purchased the gun from a person who he knew as 'D-Block', a person who was identified as Boyd." Appellant's P-C App. p. 119. This statement was actually made by Thomas during his testimony. *See* Trial Tr. p. 185. Thomas also testified that after he was incarcerated he instructed his mother to get rid of the gun. *Id.* at 188. While we agree with Boyd that the finding identifies the wrong person as the buyer of the gun, this error does not affect our prejudice analysis, and we are confident that it did not affect the post-conviction court's conclusions.

# IN THE
# COURT OF APPEALS OF INDIANA

Dabian D. Boyd,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
71A03-1702-PC-357

**Robb, Judge, concurring in result.**

[35] I concur in result. I agree Boyd did not receive ineffective assistance of counsel. But I disagree with the majority's conclusion that Boyd's trial counsel rendered deficient performance with respect to the allegedly vouching statement in the prosecutor's letter.

[36] The prosecutor's "vouching statement" was made in a letter to Gavin's attorney extending a plea offer to Gavin in his own, unrelated criminal matter. The statement was made in explaining why the State was willing to extend to Gavin the deal it was offering. It was but one sentence in a two-page letter outlining the details of Gavin's felony murder and armed robbery charges and the factors weighing in favor of a plea deal. In this context, I cannot say the statement

amounted to improper vouching. The statement was not made in the form of trial testimony or closing argument. Viewing the statement from the perspective of it being made in plea negotiations in an entirely unrelated criminal matter, I do not believe it carries the same force as a typical vouching statement made during trial. *See Hamilton v. State*, 43 N.E.3d 628, 634 (Ind. Ct. App. 2015) (holding a detective's statement during the initial police interview with the defendant that child victim's statements were "powerful" did not carry the "same vouching force as trial testimony to that effect" and were therefore not improper vouching statements), *trans. denied*.

[37] I would hold Boyd's counsel did not offer deficient performance in the first place with respect to the prosecutor's statement in the letter. But because the majority ultimately determines Boyd has failed to prove ineffective assistance, I concur in the result.