In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 15-3479

DAVID MARK FRENTZ,

*Petitioner-Appellant*,

*v.*

RICHARD BROWN,

*Respondent-Appellee*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-1311-TWP-DKL — **Tanya Walton Pratt**, *Judge*.

_____

ARGUED OCTOBER 25, 2017 — DECIDED NOVEMBER 22, 2017

_____

Before KANNE and SYKES, *Circuit Judges*, and DARROW,
*District Judge*.[*]

DARROW, *District Judge*. David Frentz filed a petition for
writ of habeas corpus pursuant to 28 U.S.C. § 2254 after the
Court of Appeals of Indiana affirmed the denial of his peti-
tion for postconviction relief in state court. That petition at-

_____

[*] Of the Central District of Illinois, sitting by designation.

tacked Frentz's conviction for the January 24, 2005 murder of his housemate, Zackary Reynolds. Before his trial on that charge, Frentz had filed a notice that he would pursue a defense of not guilty by reason of insanity, but, after consulting with an expert, did not pursue the defense. Frentz was convicted by a jury of the murder, and of associated drug charges, and sentenced to 59 years of imprisonment. He appealed to the Court of Appeals of Indiana, which affirmed. He then filed his postconviction petition in Indiana court alleging ineffective assistance of counsel for, among other things, not having pursued the insanity defense. His petition was denied, and he appealed to the Court of Appeals of Indiana, which affirmed the denial. The Indiana Supreme Court denied transfer of the case,[1] and Frentz filed a petition for writ of habeas corpus in the Southern District of Indiana. The district court denied the petition, and declined to issue a certificate of appealability. This Court then granted the certificate, finding that Frentz had made a substantial showing of the denial of his right to effective assistance of counsel because counsel failed to pursue an insanity defense.

Because the Indiana appellate court did not unreasonably apply federal law in denying Frentz's postconviction petition, we now affirm the district court's decision.

---

[1] In Indiana, the judgment of the appellate court is final unless the Indiana Supreme Court grants a Petition to Transfer, which has the effect of vacating the previous appellate judgment and giving the Indiana Supreme Court jurisdiction over the appeal "as if originally filed in the Supreme Court." Ind. R. App. P. 58(A).

I.  *Background* [2]

Frentz, who was 53, lived with Reynolds, 23, who worked on Frentz's farm in Orange County, Indiana. Frentz was an alcoholic and had been drinking heavily for 35 years; on Saturday, January 22, 2005, his doctor told him that he would die if he did not stop drinking. His doctor gave him medication to deal with delirium tremens, a symptom of alcohol withdrawal. He stopped drinking that day.

On Sunday, January 23, Frentz ran errands, worked on a pickup truck with Reynolds at the house they shared, and then ran more errands. On his way back to the house Frentz stopped at a fast-food drive-through in Salem, Indiana, between 10:00 and 11:00 in the evening. During this time he talked on his cell phone with his friend Carl Brock. Frentz told Brock that he had been "feeling bad," and had been having hallucinations, including, according to Brock "either light poles or salt shakers dancing or something like that … dogs running across the road laughing at him and stuff like that." Worried, Brock asked Frentz to call him when he got home.

Brock called Frentz an hour or two later. Frentz asked Brock and Brock's wife if either of them had heard from Dusty Austin, Frentz's ex-girlfriend. Frentz claimed to have been "fucked over" by a friend, Chuck Woolsey, who he now

---

[2] The facts pertaining to the conduct with which Frentz was charged are taken, unless otherwise stated, from the Court of Appeals of Indiana order denying Frentz's postconviction petition, *Frentz v. State*, 875 N.E.2d 453, 457–462 (Ind. Ct. App. 2007). See 28 U.S.C. § 2254(e)(1); see also *Caffey v. Butler*, 802 F.3d 884, 887–888 (7th Cir. 2015), cert. denied, 136 S. Ct. 1527 (2016) (presuming that the state courts' account of the facts is accurate unless rebutted by clear and convincing evidence).

thought to be involved with Austin. According to Brock, Frentz went during this conversation from "feeling ill and hallucinating to someone who was very sober and [not] really talkative at all." Brock made some jokes, hoping to lighten the mood; instead, Frentz hung up. Brock tried calling him back immediately, with no luck.

At about 3:30 a.m., Brock was able to reach Frentz on the phone. Frentz sounded "freaked out," and told Brock to call the police. Frentz also said during this conversation that "he put PCP in that shit and people [are] up here to fuck with us." (Brock assumed this was in reference to Woolsey.) During the conversation, Frentz was "hollering" at Reynolds, but Brock never heard Reynolds say anything back. When Brock asked to talk to Reynolds, Frentz hung up. When Brock's wife called Frentz back and asked to talk to Reynolds, Frentz hung up again.

Sometime early that morning, two of Frentz's neighbors saw and heard Frentz's pickup truck speeding down the road. Frentz called 911 at about 5:30 a.m., and said that several people were trying to break into his house. The connection cut out several times, but Frentz conveyed that people had broken into his house, that one of them was shooting, that his friend had been shot in the chest but was still breathing, that the people were still in his home, that they were "trying to get in the windows," and doors, and that he had "locked the door back." Police officers arrived at his house to find no signs of vehicle or foot traffic outside. Frentz was standing in his kitchen, looking disoriented and agitated. He opened the door for the officers, one of whom saw an SKS assault rifle lying on a kitchen chair. The police handcuffed Frentz, who was wearing only underwear and a t-shirt and

was "sweating really bad." Frentz told the officers that motorcycle-riding Mexicans had broken into his house and that there was someone in his bed. There was no sign of anyone in Frentz's bed, or any struggle or forced entry, but the officers found Reynolds, lying face-up in the hallway in a pool of blood, on top of a loaded .22 caliber rifle.

He was dead, shot three times at close range. There were traces of Reynolds's DNA on Frentz's shirt. A bullet lodged near his spine was confirmed by forensic testing to have come from the SKS. There were four shell casings in the hallway of the same caliber as the SKS. There were three bullet-holes in the door Reynolds had been standing in front of when he was shot, and also several bullet-holes in Reynolds's bedroom window. More shell casings, of the same caliber, were nearby.

Frentz told several stories about the events of that morning. First, he told officers at the scene that he had been asleep in his bedroom when he heard a scuffle at the other end of the house. He said he had grabbed the .22, walked down the hallway, and seen two Hispanic men leaving the house through the back door. He said that he had had seen Reynolds fighting with a third over the SKS, had put the .22 down and grabbed the other man, and then had heard two gunshots. The Hispanic man then left with the other two in a sport utility vehicle. The men had gotten in through a window, Frentz said.

After he had been taken to the police station and mirandized, Frentz gave a substantially similar account, adding that before Frentz had gone to sleep, Reynolds had been playing cards and drinking beer with two young white men Frentz didn't know, that he had heard a motorcycle engine

when the Hispanic men fled, and that someone had fired shots from outside the house that passed through the window and out the back door.

When interviewed by officers later that day, Frentz said that he had stopped drinking "cold turkey" on Saturday after thirty years, and had been given medication. He said that, in a conversation he had had with his mother on the phone the previous day, he had not told her mother he was hallucinating, but that he felt "fuzzy" from the medication. He said that Reynolds had been "just outside of his door" when he was shot, and that he remembered hearing three gunshots. He added that the 911 operator had told him to put pressure on Reynolds's bleeding wounds, that he had done so, and that he had loved Reynolds "like my boy."

The next morning, Frentz asked to speak with officers again. He told them that he had taken his medication the night before and that it had caused him hallucinations like it "was givin' [him] the DT's" instead of taking them away. He added that Reynolds had bought drugs that weekend from a person interested in his ex-girlfriend, Austin, and wondered whether that person might have altered the drugs and persuaded Reynolds to give him some. He denied, however, that his medication or any of the drugs he might have taken could have caused him to "just randomly start shootin' that rifle."

Frentz also spoke, while in county jail, with two other inmates, Troy Brackett and David Turner, both of whom, unfortunately for Frentz, ended up testifying at his trial. Brackett said that Frentz had told him two men, A. J. Guthrie and Eric Lloyd, had sold methamphetamine to Reynolds and then tried to steal it back. Reynolds had been accidentally

shot in the struggle that followed. Brackett also said that later, Frentz told him that Reynolds and he had argued about the drugs purchased from Guthrie and Lloyd, who had originally bought the drugs from Woolsey, who was living with Austin. According to Brackett, Frentz said he had heard a noise that night and "played to his role" and shot Reynolds with the SKS. Frentz is also supposed to have said that Reynolds "shouldn't have been messing with [his] old lady."

Turner testified that Frentz told him he had come home on Sunday and found Reynolds with Guthrie and Lloyd, then gone to bed, after rejecting Reynolds's offer of methamphetamine. Later, Frentz got up and told Reynolds that it was a bad idea to have "all that meth" in front of Guthrie and Lloyd, who later broke back in to steal it back. Turner said Frentz asked him what he, Turner, thought of this story; Turner reportedly said that, if he were on a jury, he would vote to convict Frentz. Later, Frentz told Turner a version in which Woolsey and Austin hired Mexicans to break into the house and kill him for his life insurance policy, but shot the wrong man. He also said that he had sent Reynolds to persuade Austin to come to his house, but that after Reynolds had been gone for a while, Frentz started to suspect Austin and Reynolds of being romantically entangled. That night, Frentz said he had looked out his window and seen Austin standing next to a telephone pole, and, thinking that she and Reynolds were planning to run away together, had grabbed a gun with which to confront Reynolds. Frentz then shot Reynolds, realized he'd made a mistake, and shot Reynolds twice more to kill him. Frentz told Reynolds he'd then put the .22 underneath Reynolds's body and driven his truck up and down the road in order to simulate the sound of several

vehicles leaving his house. Turner said this story kept chang-
ing until it got Turner's approval.

Frentz also offered to pay both Turner and Brackett to
drop .45 caliber shells outside his house and put pry-marks
on the windows. He told them that his brother had gone into
his house and removed $700 in cash from his jacket pocket
and an ounce of methamphetamine from his jeans pocket. At
one point, while in jail awaiting trial, Frentz received a letter
from Reynolds's father sarcastically asking for help with the
funeral expenses. Both Turner and Brackett testified that
Frentz threw the included obituary on the floor and told
Brackett that "if he was going to pay for [Reynolds's] funeral
he would have never killed him."

On January 27, 2005, Frentz was charged with murder
and felony drug possession, later amended to include felony
charges for possessing anhydrous ammonia and receiving
stolen property. Through counsel, Frentz filed a notice on
February 22, 2005 that he sought to pursue an insanity de-
fense. See Ind. Code § 35-36-2-1. Counsel consulted with Dr.
Philip Coons, and named him as an expert witness as to
Frentz's physical and mental state at the time of the charged
offenses.[3]

---

[3] Coons was deposed on December 29, 2005. Coons Dep., ECF No.
28. This deposition was not offered as evidence at Frentz's state postcon-
viction hearing, or indeed to any court before this one. However, Dr.
Masbaum, who offered testimony at Frentz's Indiana postconviction
hearing, reviewed and relied on Coons's deposition. As relevant here,
the deposition proceeded as follows.

Coons, who had reviewed documentation from Frentz's visit to the
hospital the Saturday before the shooting, and from up to and after the
arrest, indicated that the medication Frentz had been prescribed to help

Shortly after Coon was deposed, the state sought leave to have its expert examine Frentz. Before this could happen, however, Frentz's counsel withdrew Coons as a witness, which effectively prevented him from pursuing the insanity defense at trial. See Ind. Code § 35-36-2-2. At trial, Frentz's counsel did present some information that would have supported such a defense, including that doctors had advised Frentz to stay in the hospital for at least five days when he had gone there the Saturday before the shooting, and that he had claimed to be hallucinating to Brock the night before the shooting. However, neither Coons nor any other witness submitted expert testimony about Frentz's mental state to the jury.

In his closing argument, counsel argued that Frentz lacked the required mental state for murder, pointing to the fact that Frentz had quit drinking after 30 years, had been on medication, sweating, and had heard mysterious noises just before the shooting. Counsel argued, appealing to the jurors' "common sense and experience," that Frentz had been suf-

---

with alcohol withdrawal was Ativan. *Id.* at 6–9. Coons described delirium tremens as "a syndrome … that some people get when they withdraw from alcohol … characterized by visual hallucinations … fever, rapid heart rate … [it's] basically a medical emergency and it requires hospitalization when it occurs." *Id.* at 10. Frentz also stated, however, that Frentz had denied having these symptoms, despite his claim that he had suffered from hallucinations, both before and after the time of the shooting. *Id.* at 21. While Coons opined that these hallucinations were brought on by alcohol withdrawal, *id.* at 23, Coons declared himself unable to opine as to whether Frentz had acted voluntarily at the time of the shooting, *id*. at 40. This was because, Coons testified, Frentz had refused to discuss the actual moments of the shooting, while continuing to state in a general way that he hadn't shot Reynolds. *Id.*

fering from delirium tremens and hallucinating. The jury proceeded to find Frentz guilty on all counts on April 10, 2006. The Court of Appeals of Indiana affirmed, *Frentz v. State*, 875 N.E.2d 453 (Ind. Ct. App. 2007), and the Supreme Court of Indiana denied transfer, *Frentz v. State*, 891 N.E.2d 36 (Ind. 2008).

Frentz filed a petition for postconviction relief in Indiana on December 11, 2008. An evidentiary hearing was held on March 15, 2012, at which Frentz presented the testimony of Dr. Ned Masbaum, and of his trial counsel, Bart Betteau. Masbaum testified that he had recently interviewed Frentz, but had not reviewed police reports, and that in his opinion, Frentz was of "unsound mind" as a result of delirium tremens at the time the offense was committed. Postconviction Order 15, Appellant's Br. App. 38. Masbaum also stated that, for the first time, Frentz had admitted that he shot Reynolds by accident, thinking he was an intruder. Betteau testified that he had experience mounting a defense relying on insanity, and that he had no reason to believe that the trial court would have refused a request, had he made one, for funds for a psychiatric report (presumably, this meant a report authored by Coons, or some other psychiatric professional, that Betteau elected not to request). *Id.* at 17. The postconviction court found that Masbaum's conclusion was based on "selective and incomplete information," *id.* at 18, and that in order for the result of Frentz's trial to have been different, had an insanity defense been mounted, the jury would have had to accept that Frentz had stopped using alcohol and that the cessation and resulting delirium tremens had caused him to be "unable to appreciate the wrongfulness of the conduct at the time of the offense," the legal standard for avoiding guilt by reason of insanity in Indiana. *Id.* at 15; see Ind. Code § 35-

41-3-6. The postconviction court found that Frentz had not shown his trial counsel's allegedly deficient performance prejudiced him, Postconviction Order 18, and denied Frentz's petition.

The state appellate court affirmed, deeming Frentz's argument that his trial counsel was ineffective merely an attempt to relitigate the postconviction court's determination that Masbaum's opinion was based on incomplete information, and noting that Frentz had presented no information showing that his trial counsel had had reason to believe Frentz met the legal standard for insanity in Indiana. *Frentz v. State*, 989 N.E.2d 383, 2013 WL 2405197, at *8 (Ind. Ct. App. May 31, 2013). The appellate court also characterized Betteau's failure to raise the insanity defense as a strategic decision, based on Coons's evaluation. *Id.*

Frentz then filed his § 2254 petition in federal district court in the Southern District of Indiana, making several arguments, of which counsel's failure to raise the insanity defense is the only survivor. Noting that the Court of Appeals of Indiana had addressed the insanity argument on its merits, the district court rejected both Frentz's argument that the postconviction court's unwillingness to credit Masbaum's opinion had been an unreasonable factual determination, and his argument that Betteau's failure to raise the insanity defense was deficient performance that prejudiced him. *Frentz v. Brown*, No. 1:13-CV-1311-TWP-DKL, 2015 WL 5825099, at *13 (S.D. Ind. Oct. 5, 2015). As to the latter, the district court reasoned that Frentz had failed to provide evidence sufficient to overcome the strong presumption that counsel's behavior was an exercise of reasonable professional judgment. *Id.* We certified for appeal only the question of

whether counsel was ineffective for not pursuing an insanity defense.

II.      *Discussion*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, permits us to grant habeas relief when, as here, a state court reaches a decision on the merits of a claim, but only if that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). The state court whose decision we review is the last one that ruled on the merits of the issue. *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000). Frentz's sole claim before us, that his counsel rendered ineffective assistance in not ultimately electing to mount an insanity defense, is governed by the two-part analysis the Supreme Court developed in *Strickland v. Washington*, 466 U.S. 668 (1984). The test requires a petitioner to show "(1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under 'prevailing professional norms'; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial." *Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003) (quoting *Strickland*, 466 U.S. at 687–88).

We review the district court's findings of fact for clear error, and review its conclusions of law de novo. *In re Rovell*, 194 F.3d 867, 870 (7th Cir. 1999). Whether a state court's holding is an "unreasonable application of" clearly established law under § 2254(d)(1) is a mixed question of fact and law that we review de novo, but "with a grant of deference to

any *reasonable* state court decision." *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999). A state court's decision is reasonable when "at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997).

In attacking his trial counsel's performance, Frentz must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted). Counsel's ultimate decision at trial not to pursue an insanity defense is not deficient performance if counsel "has made a reasonable decision that makes particular investigations unnecessary." *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006) (quotation marks omitted).

Here, as the Court of Appeals of Indiana held, there is abundant suggestion in the record that counsel's decision not to pursue an insanity defense further than he did was within the wide spectrum of permissible strategic decision-making. Frentz's attorney initially notified the state that he would pursue the defense, suggesting that he, like the courts that have reviewed this case, thought that Frentz's recent abstinence, after years of drinking, might at least potentially have resulted in hallucinations or other mental incapacity on the morning of the shooting. Frentz's statements shortly after the shooting suggest that, at least on some occasions on the day before and the days following, he suffered from visual hallucinations. But Coons, the expert retained to evaluate Frentz, could offer, at least at the time of his deposition, no further opinion as to whether Frentz was suffering from such hallucinations at the time that, the jury determined, he shot Reynolds. Counsel's decision to retain Coons, consult with him,

and then not pursue the defense further, is consistent with researching and deciding for strategic reasons not to pursue the insanity defense.

Such potential reasons practically leap from the record. Frentz changed his story several times, suggesting lucid recall of the events and careful attempts to fabricate a cover story, rather than confusion or an inability to remember exactly what had happened. The testimony of the jailhouse informants, Turner and Brackett, if credited by the jury, was particularly damaging, both in that it showed a callous disregard for Reynolds's life inconsistent with having killed him by accident while hallucinating, and in that it suggested that Frentz had attempted to conceal his crime by creating cover stories, beginning almost immediately after the commission of the crime itself when he reportedly drove his truck up and down the road outside his house (a detail corroborated by other witnesses). A jury could easily have relied on this evidence in disbelieving any claim of mental incapacity Frentz might have sought to offer, particularly if there was no evidence to be offered, either via Frentz's own potential testimony or the testimony of experts, that he was actually or likely suffering from hallucinations at the time of the shooting. Frentz's attorney could have determined that such an unsupported claim would be more likely to inflame than to persuade the jury, and strategically not have brought it.

Frentz argues that because Coons didn't render an opinion as to his sanity at Coons's deposition, or elsewhere on the record, before counsel decided not to pursue the insanity defense, counsel must have been deficient in failing to en-

gage another expert and to present the insanity defense.[4] Appellant's Br. 20–21. But this line of argument assumes, without support beyond Masbaum's testimony, that it was or should have been evident to counsel that an insanity defense would have been meritorious and should have been pursued. For all the evidence on the record, counsel may well have consulted further with Coons, spoken with his client more, or asked Coons to speak with Frentz again, and determined on the basis of that research that an insanity defense would be unavailing.[5] Frentz offers no evidence to the contrary.

Furthermore, we do not find that the postconviction court's unwillingness to credit Masbaum's minimally supported opinion was an unreasonable determination of the facts. Rather, it appears eminently reasonable for the postconviction court not to have accepted Masbaum's determina-

---

[4] Respondent argues that Frentz failed to make this failure to investigate claim as part of his ineffective assistance of counsel argument before the Indiana courts, and that he has therefore procedurally defaulted it. Respondent's Br. 14. However, as explained here, neither counsel's decision not to engage another expert, nor his eventual decision to withdraw the expert and not make an insanity argument before the jury, were ineffective in any case.

[5] One suspects, too, reading Coons's deposition closely, that the doctor may have engaged in a certain amount of strategic hedging when asked point-blank by counsel for the government whether Frentz had been able to appreciate the wrongfulness of his actions on the morning of January 24. Coons was unable to opine even tentatively that Frentz's alcohol withdrawal had impaired his judgment. Instead he demurred, saying that Frentz's condition "may have had," Coons Dep. 40, some effect on his ability to make decisions, and attributing his uncertainty to not having been able to ask Frentz about the "point in time," *id.*, when the shooting happened.

tion that Frentz was legally insane at the time of the shooting, when that determination was rendered on partial consideration of the record evidence, which showed that Frentz never admitted to having hallucinated at the time of the shooting, and when Coons's own evaluation, upon which Masbaum claimed to rely, had been indeterminate. In addition, Masbaum's opinion rested on Frentz's own potentially strategic alteration of his story. Frentz had told Masbaum a different story than he had told Coons, admitting five years after the fact to having shot Reynolds. This could easily be construed by the Indiana postconviction court as a self-serving attempt to get a second bite at the apple. One of the reasons Coons professed himself unable to say whether Frentz had been insane at the time of the shooting is that Frentz had not described the moment of the shooting to Coons, and maintained that he had not shot Reynolds. A defense of insanity—having shot Reynolds but not being guilty of it by reason of mental state—is, at least logically, incompatible with a defense of not having shot Reynolds at all. See *Wisehart v. State*, 693 N.E.2d 23, 38–39 (Ind. 1998) (collecting cases where courts have rejected claims of ineffective assistance of counsel for failing to raise a defense based on mental state because such defenses would have conflicted with the trial defenses of actual innocence). Frentz's apparent adamance at the time of trial that he did not shoot Reynolds likely posed formidable obstacles to any argument counsel might have wanted to make that Frentz did shoot Reynolds but was not culpable of it because he was insane.

Certainly, none of the evidence Frentz has submitted is sufficient to show the Court of Appeals of Indiana was unreasonable in finding Frentz's trial counsel was not ineffective.

Turning to the prejudice portion of *Strickland*, it is also easy to see that the appellate court was not unreasonable in finding Frentz suffered no prejudice by his attorney's decision not to bring the insanity defense. Frentz must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* And, in review of the state court's decision, we must allow "the state court's conclusion to stand if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997).

As Frentz observes, while his trial counsel did not mount an insanity defense, he attempted to use the evidence Frentz thinks should have been put toward the insanity defense— his possible delirium tremens and hallucinations, more or less—to negate the intent element of Indiana murder. See *Ramsey v. State*, 723 N.E.2d 869, 871 (Ind. 2000) (murder is the knowing or intentional killing of another). Evidence about Frentz's drinking and abstinence was introduced, as was Brock's description of Frentz's reported hallucinations. And counsel argued in closing that Frentz had suffered from hallucinations, and might have suffered from them during the crucial moments at which he shot Reynolds. Frentz acknowledges all of this, but argues that without scientific explanation, in the form of expert testimony, about what delirium tremens is and how it might have affected Frentz's judgment and consciousness, and without an insanity-defense instruction, the jury was unable to determine, as they should have, that Frentz was unable to appreciate the wrongfulness of his conduct at the time of the offense. See Ind. Code § 35-41-3-6.

But Coons's expert testimony, as conveyed in his deposition, would add little to the layperson's sense, adequately conveyed by the testimony at trial, that Frentz might have suffered visual and auditory hallucinations, or been disoriented as to where he was and the identity of the people with whom he was interacting. It is difficult to see how the addition of Coons's (or another doctor's) medical analysis of such symptoms would have lent more weight to counsel's argument, or how a jury, given the added option to find Frentz not guilty by reason of insanity, would have done so on the strength of just this evidence, when, in the event, that same jury did find him guilty of a knowing or intentional killing. In any case, the Court of Appeals of Indiana did not rule unreasonably when it determined that the outcome would have been the same had Frentz's attorney presented the insanity defense. See *Stevens v. McBride*, 489 F.3d 883, 893 (7th Cir. 2007) (deferring to Indiana Supreme Court's conclusion that no jury could conclude defendant did not appreciate the wrongfulness of his acts at the time of a killing).

For these reasons, we AFFIRM the district court's denial of a writ of habeas corpus.