In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3282

FREDRICK A. LAUX,

*Petitioner-Appellant*,

*v.*

DUSHAN ZATECKY,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 14-CV-340 — **Sarah Evans Barker**, *Judge*.

ARGUED FEBRUARY 21, 2018 — DECIDED MAY 17, 2018

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2002, Fredrick Laux broke into
his ex-wife's home and murdered her with a crowbar. A jury
in Grant County, Indiana, decided that the aggravating
circumstance of Laux's crime—that he committed murder
during a burglary—outweighed the primary mitigating
circumstance—that he had no criminal history. The jury
recommended a sentence of life without parole, which the
state trial judge imposed. The Indiana state courts affirmed

Laux's convictions and sentence. After a post-conviction hearing, they also rejected the claim that his trial counsel provided ineffective assistance in violation of the Sixth Amendment to the U.S. Constitution.

In 2014, Laux filed a federal petition for a writ of habeas corpus. The district court denied the petition. On appeal, Laux contends that his trial counsel was ineffective by not fully investigating and presenting all of the available mitigating evidence about Laux's childhood that surfaced at his 2011 post-conviction hearing. If his trial counsel had presented all of these details in 2002, Laux argues, there is a reasonable chance that the jury would not have recommended a sentence of life without parole. We affirm the judgment of the district court. The state courts' conclusion that Laux received effective assistance of counsel was not unreasonable.

I. *Factual Background and Procedural History*

    A. *The Murder Trial and Penalty Phase*

Laux's state public defender said at the outset of his post-conviction proceeding, "there is really no doubt about who killed Heidi Laux. And this trial"—the subject of Fred Laux's ineffective assistance claims here—"was all about what punishment Mr. Laux was set to receive" for what he did to his ex-wife.

After eleven years of marriage and a period of separation, the couple divorced in November 2001. Distraught by the divorce, and increasingly disturbed by the prospect that Heidi had found a new partner, Laux made a romantic gesture toward Heidi on Valentine's Day in 2002. He was rebuffed. Heidi and Laux, along with their two daughters, attended a social event the next evening where "Laux became

increasingly suspicious that Heidi was involved with a co-worker." *Laux v. State*, 821 N.E.2d 816, 817 (Ind. 2005) (*Laux I*).

Laux returned home and put his daughters to bed, but remained fixated on Heidi's new life without him. The Indiana Supreme Court explained what happened next:

> Around 3 a.m. the following morning, Laux awoke and decided to "fix" Heidi. He dressed in two pairs of sweatpants, a sweatshirt, gloves, a hat, and a ski mask. He collected a flashlight and a crowbar and ran to Heidi's house.

> Upon arrival, Laux used the crowbar to pry open a coal chute and gain entrance to Heidi's house. He entered the basement through the chute and made his way upstairs. Laux proceeded to Heidi's bedroom, struck her three times with the crowbar, strangled her, and left. She died from her injuries within twenty minutes.

> The State charged Laux with murder, felony murder, and burglary resulting in bodily injury. It later requested a sentence of life in prison without parole. After a three-day trial, the jury found Laux guilty on all counts and recommended life in prison without parole. The trial court merged Laux's murder and felony murder convictions and sentenced him to life in prison without parole for the murder and a consecutive term of twenty years for the burglary.

*Id.* at 817–18 (footnotes omitted). Because Laux contends that his trial counsel was ineffective in failing to ward off a life sentence, we focus on the penalty stage of his trial.

In Indiana, "life without parole is imposed under the same standards and is subject to the same requirements" as

imposing the death penalty. *Ajabu v. State*, 693 N.E.2d 921, 936 (Ind. 1998). This meant that with no dispute as to guilt, Laux's trial came down to the penalty phase where the jury considered the aggravating and mitigating circumstances that surrounded the crime. See Ind. Code § 35–50–2–9(b), (c), (d). By statute, if a jury finds that aggravating circumstances outweigh mitigating circumstances and thus decides to recommend life without parole, its recommendation must be accepted by the trial judge at sentencing. § 35–50–2–9(e).

In the penalty phase of his trial, Laux's jury heard evidence that he broke in to Heidi's house that night intending to beat her with his crowbar and kill her, and possibly also to rape her. This undisputed evidence was the basis for Laux's burglary conviction, which in turn was the aggravating circumstance under § 35–50–2–9(b)(1)(B) for his murder conviction.

As for mitigating circumstances, Laux qualified for only one of the seven circumstances specified by statute—no prior criminal conduct. § 35–50–2–9(c)(1). The law also permitted the jury to weigh any "other circumstances appropriate for consideration." § 35–50–2–9(c)(8). Laux's trial counsel used this opportunity to present him as a devoted father and devout Catholic of above-average intelligence who, in the words of a psychiatrist, had been overtaken by a "severe mental disease at the time of the offense" (i.e., "major depression").

Because Laux was found to be sane at the time of the offense, his mental condition did not qualify as one of the express mitigating circumstances under the law. See § 35–50–2–9(c)(6). Jurors heard from two experts about Laux's episode of depression and related medications. These experts

formally testified as the State's witnesses, though they had been appointed by the trial court at the behest of Laux's trial lawyer, who reviewed their written reports ahead of their testimony. Both Dr. Parker (a psychiatrist) and Dr. Atkinson (a psychologist) had interviewed Laux and studied his personal history and mental health. Though their diagnoses differed somewhat, both experts rejected the idea that Laux's mental-health struggles caused him to commit the murder.

Laux's lawyer called as a witness a priest who had known Laux for over fifteen years, since Laux had been a student at Purdue University. In the priest's judgment, Laux was a particularly devoted Catholic. The priest also shared that because Laux was so distraught after the police came to inform him of Heidi's death, the priest had to inform Laux's young daughters about their mother's murder. After the priest's testimony, Laux's lawyer called a Catholic school teacher who had one of Laux's young daughters in her class. She reported that Laux was a devoted father and active in their parish. Finally, Laux himself took the stand to express his remorse and to (try to) explain his actions.

In his closing statement in the penalty phase, Laux's trial lawyer stressed that Laux had no history at all of violent behavior or criminal activity. His lawyer repeated that even if it did not legally amount to a defense, Laux had a "severe mental disease" according to the experts. "I understand the State wants you to ignore that," his lawyer continued, "but that's a fact, that's what was said by the doctors and those are doctors … that's not my diagnosis." "[D]on't just totally discount that and throw that in the trash. That's the whole reason we did this trial was to get that story before you."

Laux's lawyer summed up by reminding the jurors that Laux "had something go seriously, tragically wrong with his thinking that night … all I'm asking you to do is weigh that as a [factor in] mitigation [regarding] … whether he should go to jail for the rest of his life. You can't discount that and say it didn't happen." The jury recommended life without parole.

B.  *Post-trial Procedural History*

1.  *State Court Proceedings*

a.  *Direct Review*

Laux appealed his life-without-parole sentence directly to the Indiana Supreme Court, which has jurisdiction over such appeals. Ind. App. R. 4(1)(a). Before rendering a decision, however, the Supreme Court remanded Laux's case to the state trial court for additional findings in light of *Ring v. Arizona*, 536 U.S. 584 (2002), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and a conforming change in state law specifying that aggravating circumstances must be proven beyond a reasonable doubt. Ind. Code § 35–50–2–9(*l*); see also *Corcoran v. Neal*, 783 F.3d 676, 678 n.2 (7th Cir. 2015); *Laux I*, 821 N.E.2d at 818, 821; *id.* at 824 (Sullivan, J., dissenting). The Indiana Supreme Court decided in 2005 to vacate a no-contact order that had been imposed to prevent Laux from contacting Heidi's family and his children, but otherwise affirmed Laux's sentence. *Laux I*, 821 N.E.2d at 818–23.

Justice Sullivan dissented, finding that the mitigating circumstances (as presented by Laux's trial lawyer) warranted a sentence "less than life without parole." *Id.* at 825 (Sullivan, J., dissenting). Laux's "blemish-free legal history throughout his childhood and adulthood" in Justice Sullivan's view entitled Laux to "consideration upon committing a first

offense," even one of this magnitude. *Id.* Since "absence of criminal history is the weightiest of all mitigating circumstances," and "following graduation from high school and Purdue University, Laux was hard-working, honest, and responsible," Justice Sullivan would have found that the aggravating circumstance of burglary did not compel life without parole. *Id.* He believed sixty-five years in prison was a more appropriate sentence, given the presence of weighty circumstances on both sides. *Id.*

### b. *Post-Conviction Review*

In line with the normal practice in Indiana, see *Brown v. Brown*, 847 F.3d 502, 512–13 (7th Cir. 2017), Laux did not argue ineffective assistance of counsel on direct review of his sentence. He first raised those arguments in the post-conviction petition he filed in 2005 and later amended in 2011. See *Laux v. State*, 985 N.E.2d 739, 743–44, 743 n.1 (Ind. App. 2013) (*Laux II*). To develop a record for these claims nine years after trial, the state public defender representing Laux called his trial lawyer, his appellate lawyer, his sister, Dr. Parker (the psychiatrist), a juror, and an acquaintance who once worked for Laux at a retail store. Though Laux raised a host of issues in his state post-conviction proceedings, he has focused our attention in this appeal on just one issue: whether his trial lawyer provided ineffective assistance by failing to investigate fully and present mitigating evidence with respect to his childhood and family history.

On this score, the state public defender elicited the following evidence at the post-conviction hearing. Laux's trial lawyer had about ten years of legal experience at the time, but he had never before served as lead counsel on a murder case as of the fall of 2002. As part of the lawyer's preparation, he

reviewed the Indiana Public Defender Council's life-without-parole materials since, in his recollection, "I don't think" a trial like Laux's "had been something that anyone [around] here had done before." He prepared for the penalty phase of Laux's trial as he had for other cases, by speaking to Laux himself "about his history and his family and who he thought … would be beneficial" to call as a witness in mitigation. Laux's lawyer could not remember clearly whether he had spoken to Laux's family members, but thought he had at least seen some correspondence from Laux's sister. Laux's lawyer also requested court-ordered psychological examinations for his client, and he reviewed the resulting written reports before examining Dr. Parker and Dr. Atkinson at trial.[1]

Although Dr. Atkinson had passed away between Laux's trial in 2002 and his post-conviction hearing in 2011, her pre-trial report was discussed at length in the post-conviction hearing. Dr. Atkinson had reported before trial that Laux's father had been an alcoholic whose drinking had caused financial problems for the family. Laux's mother had been present but emotionally distant from the children; she was later diagnosed with paranoid schizophrenia after Laux and his three sisters had reached adulthood. Dr. Atkinson repeated Laux's characterization of his relationship with his siblings by saying "he and his sisters were close and 'clung'

---

[1] If the accused intends to pursue an insanity defense in Indiana, the court must appoint at least two mental health experts. See *Frentz v. Brown*, 876 F.3d 285, 291 (7th Cir. 2017); see also Ind. Code § 35–36–2–2 (2002). As noted, Laux did not qualify for an insanity defense, but by requesting mental-health examinations, his lawyer made it possible for the jury to hear independent expert opinions about his personal history and mental-health struggles.

together because of the lack of support and interest from the parents."

Laux's sister Paula added more details to this story when she testified at the post-conviction hearing in 2011. Paula reported that "money was real tight growing up" because of their father's drinking and spending habits. Laux's father would often be nude around the house, and he took his children along when he went to see R-rated and even X-rated movies. Paula also testified that their mother had gotten a job at a canning factory when the children were adolescents, but by 1991 when Laux was an adult, her paranoia had grown worse and culminated in hospitalization and her schizophrenia diagnosis. The parents' marriage was far from a happy one, but it did not become physically abusive. When the two would fight, their daughters would "wait to see if it got violent. And it never did." Though Paula admitted that she did not remember a lot about her childhood, and speculated that she had "blocked a lot of it out," she had no opportunity to share these details at Laux's trial because no one from his defense team had ever interviewed her.

Dr. Parker testified last, and much of his testimony was devoted to criticizing the diagnosis Dr. Atkinson had presented at trial: that Laux suffered from anti-social personality disorder. Though Dr. Parker had not met with Laux since his pre-trial interview almost a decade before, he described Laux as having "a very limited range of emotion." Dr. Parker opined at length that Dr. Atkinson had misinterpreted Laux's cold, distant demeanor as a lack of remorse, resulting in a misdiagnosis. On this point, post-conviction counsel and Dr. Parker had the following exchange:

Q. Earlier you stated the lack of remorse could have other alternative explanations besides being anti-social since in your opinion, Mr. Laux is not anti-social, what are those?

A. Mr. Laux comes from a dysfunctional family. His father was an alcoholic throughout his upbringing. His mother … had pre-morbid schizophrenia[.] … So if he grew up in a family where the display of emotion was not encouraged, was not shown, was not modeled, and it was not welcome as far as I can tell, he reacted as many first children of alcoholics do by working very hard and trying to be as successful as possible[.] … So I think the reserve, the difficulty with emotions, has a better explanation in his family, and the dynamics of that family, than in calling it a lack of remorse.

Dr. Parker acknowledged, though, that when he analyzed Laux before trial, he knew Laux's mother had suffered from late-onset mental illness. Dr. Parker also did not retreat from his own diagnosis—that Laux was depressed, but the murder was not related to his depression.

The state trial court denied post-conviction relief in a thorough order. Supp. App. 392–402. After discussing the *Strickland* standard, the post-conviction judge explained point by point why none of Laux's claims of ineffective assistance merited relief. The court briefly described the penalty phase and noted that Laux's one undisputed mitigating circumstance (no criminal history) was not overlooked. The mitigating evidence advanced at the post-conviction stage, the judge concluded, would also not have made a difference

to the Indiana Supreme Court when it weighed Laux's sentence on direct review.

The Indiana Court of Appeals—whose decision we review here under 28 U.S.C. § 2254(d)(1)—affirmed the post-conviction court in all respects. *Laux II*, 985 N.E.2d at 755. Citing *Strickland* and related state cases repeatedly, the state appellate court found that "Laux was provided effective representation of counsel at the penalty phase," *id.* at 751, and commented that the "pursuit of mental health evidence to support his mitigation [case] was sound strategy" on the part of trial counsel, *id.* at 754, even if the jury did not in the end find for Laux.

The appellate court rejected Laux's argument that his lawyer was ineffective for failing to put on childhood mitigation testimony. It decided that "the evidence presented through Laux's sister was not mitigating" because in the opinion of the Indiana judiciary, "such family anecdotes have little, if any, mitigating value." *Id.* at 752. Even if they did, "the evidence of Laux's childhood and background fail[s] to show so much as significant hardship," especially since Laux himself was never abused and later became a productive adult. *Id.* at 752. The Indiana Supreme Court denied transfer. 987 N.E.2d 521 (Ind. 2013).[2]

---

[2] Because the Indiana Supreme Court's summary denial of transfer did not specifically address Laux's *Strickland* claims, we "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" for denying his federal claims. See *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The decision of the state court of appeals, then, is the one we examine here under § 2254(d)(1).

2. *Federal Court Proceedings*

In 2014, Laux filed a *pro se* habeas corpus petition in federal court. He raised four claims that echoed his claims in the state courts. The district court found one claim procedurally defaulted and rejected the other three on the merits, including the claim that Laux's trial lawyer had been ineffective during the penalty phase of his trial. The court found that "the unpresented mitigation evidence discussed above is not nearly as compelling as the types of childhood mitigation evidence the Supreme Court has found to be prejudicial." App. 46. As a result, the district court concluded under 28 U.S.C. § 2254(d)(1) that the state court's *Strickland* analysis was not unreasonable; it was instead "eminently reasonable" for the Court of Appeals to deal with the unpresented evidence and expert post-conviction testimony as it did.

II. *Analysis*

A. *Habeas Corpus Review of Ineffective Assistance of Counsel in State Court*

Our standard of review in this context is familiar. "We review the district court's decision denying habeas relief de novo," but must give significant deference to state court decisions adjudicating federal constitutional claims on the merits. *Carter v. Duncan*, 819 F.3d 931, 940 (7th Cir. 2016). Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, we must give effect to state court decisions on the merits of a claim "unless the adjudication of the claim— … resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A claim for ineffective assistance of counsel adds another layer of deference in our review. The defendant or petitioner must show "that counsel's performance was deficient" in that it was objectively unreasonable under the circumstances (the performance prong), and the defendant or petitioner must also show that such "deficient performance prejudiced the defense" (the prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687, 688 (1984). This inquiry into a lawyer's performance and its effects turns "on the facts of the particular case," which must be "viewed as of the time of counsel's conduct." *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993), quoting *Strickland*, 466 U.S. at 690.

As for the performance prong, because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," *Strickland* directs courts to adopt "a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell v. Cone*, 535 U.S. 685, 702 (2002), quoting *Strickland*, 466 U.S. at 689. The prejudice prong requires the defendant or petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

When these standards are combined, the deference given to the state court decision under review is considerable. "The text of § 2254(d)(1) … suggests that the state court's decision must be substantially different from the relevant precedent of" the Supreme Court to lose deference, which in cases involving *Strickland*, is not lost even when a state decision is

at odds with "the federal court's conception of how *Strickland* ought to be applied in that particular case." *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). Indeed, the Supreme Court has said that in such cases the "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

B.  *Strickland Claims Involving Mitigating Evidence*

The *Strickland* protections apply not only in criminal trials but also at sentencing, where the defendant's counsel is expected to offer a case to mitigate punishment. See *Cone*, 535 U.S. at 697–98; *Fretwell*, 506 U.S. at 366; *Strickland*, 466 U.S. at 686–87; see also *Griffin v. Pierce*, 622 F.3d 831, 843–45 (7th Cir. 2010). The Supreme Court has taught that defense counsel has an "obligation to conduct a thorough investigation of the defendant's background" in advance of such proceedings, with an eye toward evidence that speaks in the client's favor. *Williams*, 529 U.S. at 396. Evidence tending to show that the accused had survived a "childhood … filled with abuse and privation," that the accused suffered from developmental limitations, or that his "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation" can all be relevant to a "jury's appraisal of his moral culpability," and thus the sentence. *Id.* at 398.

This duty to present mitigating evidence goes beyond facts that will directly "undermine or rebut the prosecution's … case" regarding the crime because mitigating evidence "may alter the jury's selection of penalty" even if it is purely biographical. *Id*. For their part, state courts applying *Strickland* to mitigation cases must be sure to "evaluate the totality of the available mitigation evidence" in deciding whether counsel

was ineffective. *Id.* at 397–98; see also *Porter v. McCollum*, 558 U.S. 30, 41 (2009); *Baird v. Davis*, 388 F.3d 1110, 1115 (7th Cir. 2004) (discussing state court responsibilities in assessing mitigating circumstances).

This means that counsel in a penalty phase is responsible for reasonably investigating the defendant's background and must present useful mitigation evidence, unless counsel decides not to pursue certain approaches for reasonable strategic reasons. The Supreme Court explained this requirement in *Wiggins v. Smith*:

> In finding that [counsel]'s investigation did not meet *Strickland*'s performance standards, we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. … [However,] "strategic choices made after less than incomplete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.*, at 690–691. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691.

539 U.S. 510, 533 (2003), quoting *Strickland*, 466 U.S. at 690–91. We have applied this deferential reasonableness standard before where counsel must decide how best to present mental health expert testimony and diagnoses, and where further development of that evidence could pose legal risks for the client. See, e.g., *Frentz v. Brown*, 876 F.3d 285, 293–95 (7th Cir. 2017).

*Strickland* cases, especially in the mitigation evidence context, are not easy for petitioners to win. This is especially true where, as here, "the new evidence 'would barely have altered the sentencing profile presented'" in the trial court. *Porter*, 558 U.S. at 41, quoting *Strickland*, 466 U.S. at 700. Yet, in capital or life-without-parole cases, there is often at least some basis for this kind of argument. With the benefit of hindsight, a defendant can often point to some additional subject and argue it should have been pursued further. The Sixth Amendment does not require counsel to investigate every conceivable line of mitigation evidence—it requires counsel to make reasonable decisions about which matters to pursue. *Wiggins*, 539 U.S. at 533. We now turn to the decision challenged in this appeal.

C.  *Reasonableness of the Laux II Decision*

1.  *Trial Counsel's Performance*

The *Laux II* court recounted the same facts presented above: Laux's trial lawyer made efforts to educate himself about the life-without-parole procedures. He reviewed expert reports ahead of time, and he cross-examined those experts "thoroughly" in the penalty phase to help elicit mitigating details. *Laux II*, 985 N.E.2d at 751–52. Laux's trial counsel also "called two lay character witnesses, in addition to Laux, to discuss Laux's lack of criminal history, his mental instability shortly before the murder, and his traits as a devoted father, Catholic, and husband, in an effort to gain sympathy from the jury." *Id.* at 751. The court then discussed the post-conviction testimony from Dr. Parker, Laux's sister, and his former co-worker. *Id.* at 752. From all this the state court found that trial "counsel's focus on Laux's mental health, devotion to his faith, and children was a reasonable tactic to employ considering

the de minimis value of the proffered childhood testimony." *Id.* at 753.

This analysis is not inconsistent with *Cone*, *Richter*, and *Williams*. The state court's reasoning considered the entire record and concluded that trial counsel provided objectively reasonable assistance. This was not an unreasonable application of *Strickland*. While the record does not clearly establish whether or not Laux's trial lawyer ever spoke to his sister, compare Supp. App. 273, with *id.* at 285, 347, counsel arranged for the mental health experts' evaluations, read about Laux's personal history and discussed it with him, shaped expert and lay opinion testimony at trial to benefit Laux, and highlighted for the jury Laux's non-violent past and positive character traits.

The trial lawyer's decision to leave the mitigation case at that was not objectively unreasonable under *Strickland*. The mitigation evidence he presented, in fact, was enough for one Justice of the Indiana Supreme Court to have agreed that the aggravating and mitigating circumstances were in equipoise, warranting appellate intervention. But in the end, this was a minority view, and one that did not implicate *Strickland*. See *Laux I*, 821 N.E.2d at 823–25 (Sullivan, J., dissenting).[3] The

---

[3] Indiana's appellate courts have substantial discretion to revise sentences they believe are "inappropriate in light of the nature of the offense and the character of the offender." *Laux I*, 821 N.E.2d at 824 (Sullivan, J., dissenting), quoting Ind. App. R. 7(B); see also *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018) (explaining that Article 7, Sections 4 and 6 of the Indiana Constitution grant this power). Justice Sullivan did not reach any conclusion about whether the jury's contrary view was reasonable; his analysis simply concluded that Laux's "absence of any

*Laux II* court recounted all of these facts and reached the not-unreasonable conclusion that *Strickland* did not require more than what Laux's lawyer did for him.

> 2. *Prejudice to the Defendant*

The state court's decision on the prejudice prong was also not unreasonable. Unlike *Porter v. McCollum*, the new mitigation evidence here "would barely have altered the sentencing profile presented." 558 U.S. at 41, quoting *Strickland*, 466 U.S. at 700. The state court adopted the State's view of this mitigation evidence:

> … Laux's trial counsel presented a penalty phase case in which the jury saw a defendant who was emotionally drained from a divorce with the woman he still loved, accepted responsibility for his actions, was suffering from mental defects, had an acute momentary lapse of reason, genuinely regretted his actions, had no prior criminal history, was educated, had a strong work ethic, and had been a devoted father, Catholic, and husband.

*Laux II*, 985 N.E.2d at 752. In comparison, "the evidence of Laux's childhood and background fail[s] to show so much as significant hardship." *Id.* Since he was never "a victim of abuse or neglect," "was never in trouble," and "excelled in both high school and college," the stories of his difficult childhood were little more than "family anecdotes" in the judgment of the state court. *Id.* There was no reasonable probability, according to the state court, that the result of

---

prior criminal history" met his own standard for relief. *Laux I*, 821 N.E.2d at 825 (Sullivan, J., dissenting).

Laux's penalty phase would have been any different even if Dr. Parker's professional rebuttal had been offered and Laux's sister had testified. *Id.*

This was not an unreasonable application of *Strickland*. In *Griffin v. Pierce*, we collected the relevant Supreme Court cases finding that petitioners were prejudiced by their lawyers' failures to present childhood mitigation evidence. 622 F.3d 831 (7th Cir. 2010). Laux's childhood difficulties pale in comparison to the "nightmarish" childhoods of those petitioners:

> *Rompilla v. Beard*, 545 U.S. 374, 390–93 (2005) (mitigation case built on evidence that petitioner was raised in a "slum environment," quit school at 16, and had a serious drinking problem; test results pointed to schizophrenia and other disorders; … his parents were severe alcoholics who drank constantly; there was no expression of parental love, affection or approval, only yelling and verbal and physical abuse; … his mother went missing frequently for several weeks at a time; and he suffered from fetal alcohol syndrome); *Wiggins*, 539 U.S. at 535 (petitioner suffered "severe privation and abuse … while in the custody of his alcoholic, absentee mother," physical torment, sexual molestation, rape in foster care, homelessness, and diminished mental capacities …); *Williams*, 529 U.S. at 395–96 (mitigation evidence included records of "nightmarish childhood," involving severe and repeated beatings by petitioner's father and criminal neglect by both parents, placement in an abusive foster home during parents' incarceration, and petitioner was

"borderline mentally retarded" and did not go beyond
sixth grade).

*Id.* at 844. Laux's post-conviction hearing record contains nothing comparable. The state court thus did not unreasonably apply *Strickland* within the meaning of § 2254(d)(1) when it decided that Laux's childhood mitigation evidence would likely have had minimal value to the jury.

In essence, Laux's prejudice argument depends on the proposition that the jury needed greater "context [for] his limited emotional capacity," the kind of context that Dr. Parker later gave in his post-conviction rebuttal to Dr. Atkinson's diagnosis. Appellant Br. at 42; see also Supp. App. at 372–73. His emotional development, Laux contends, "was stunted." Appellant Br. at 43. This argument is essentially an attempt to rebut the expert testimony actually presented in the penalty phase (which gave no special moment to Laux's childhood) with other facts that those experts had in their possession at the time. See *id.* at 43–44; Appellee Br. at 4; Supp. App. at 2–3, 14–15, 49–52, 87–91. In other words, Laux now wants to re-write his psychological profile for this court. Since the stringent AEDPA standard of review was designed to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law," *Cone*, 535 U.S. at 693, this argument is misplaced. The state courts did not apply Supreme Court precedent unreasonably when they found that Laux's later-discovered childhood mitigation evidence did not undermine confidence in the results of his original sentencing proceeding.

### 3. *Weighing Childhood Mitigation Evidence*

Though the *Laux II* court's weighing of the mitigation evidence was not unreasonable under § 2254(d)(1), Laux does raise one argument about that decision that is well-taken. In adopting the State's analysis, the state court cited *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007), for the proposition that Indiana courts believe "evidence of a difficult childhood warrants little, if any, mitigating weight." *Laux II*, 985 N.E.2d at 752. *Ritchie* observed that although state courts must consider childhood mitigation evidence as a matter of federal law, Indiana courts generally do not give it much weight in their analysis of prejudice under *Strickland*. See 875 N.E.2d at 725, citing *Williams*, 529 U.S. at 398. To explain why this approach is troubling but does not deprive the *Laux II* decision of the deference it is due under AEDPA, we first describe *Ritchie* before returning to *Laux II*.

The relevant portion of *Ritchie* dealt with appellate counsel's failure to make an argument under Indiana Appellate Rule 7(B), which gives Indiana's appellate courts the equitable power to revise sentences they deem inappropriate. The defendant in *Ritchie* shot and killed a police officer. 875 N.E.2d at 713. The defendant's childhood was blighted by learning disabilities, trouble in school, an unstable home environment, a suicide attempt, several unfortunate head injuries, and other problems. *Id.* at 720–23. Much of this evidence was presented in some form in the penalty phase of Ritchie's trial, but his post-conviction counsel later found additional reports and experts to strengthen Ritchie's inappropriateness argument. *Id.* at 719–20. The *Ritchie* court concluded that the defendant had "failed to show that the outcome of his direct appeal would have

been any different had appellate counsel raised a 7(B) challenge to his sentence" in light of the low weight Indiana's courts tend to give to childhood mitigation evidence. *Id.* at 726.

The problem here is that the *Laux II* court lifted *Ritchie*'s "little, if any mitigating weight" idea out of the Appellate Rule 7(B) context, where it was offered as an empirical description of the tendencies of the state's appellate courts, and applied it instead to a penalty-phase factfinder who must weigh all of the evidence in mitigation without such preconceived notions. Federal law does not permit sweeping generalizations about the likely weight of certain kinds of evidence when assessing prejudice under *Strickland* in front of a penalty-phase jury.

Laux argues that the categorical *Ritchie* approach is contrary to *Wiggins*, where the Supreme Court declared that the "mitigating evidence counsel failed to discover and present" to the jury was "powerful" because it included significant childhood abuse, torment, and "diminished mental capacities." 539 U.S. at 534, 535, 536. Likewise, the portion of *Williams* that the *Ritchie* court cited criticized a state court that "did not entertain [the] possibility" that a jury may have been influenced by a "graphic description of Williams' childhood, filled with abuse and privation." 529 U.S. at 398.

*Laux II*'s citation to *Ritchie* is troubling, but not decisive. First, the approach indicated in *Ritchie* is not wrong as a matter of clearly established federal law, but it can easily be misapplied outside of *Ritchie*'s peculiar context—the decision-makers relevant to *Ritchie*'s "little, if any, mitigating weight" observation were state appellate judges exercising discretionary state law power, not juries or trial judges

finding facts in penalty phases, where *Wiggins* and *Williams* apply. Second, though the analysis in *Laux II* blurs this important distinction in a way that can be misunderstood, the state court's bottom-line conclusion that Laux was not prejudiced by his trial counsel's penalty-phase presentation is still not unreasonable.[4]

This approach noted in *Ritchie* is not contrary to *Wiggins*, *Williams,* or *Rompilla* because it pertains to an equitable power of state appellate courts that is separate and apart from Indiana's statutory capital sentencing process. Compare Ind. App. R. 7(B) with Ind. Code § 35–50–2–9. Under either process, any appropriate mitigating evidence may be considered. See *Ritchie*, 875 N.E.2d at 725; Ind. Code § 35–50–2–9(c), (c)(8) ("The mitigating circumstances that may be considered" by the factfinder (which is usually a jury) include seven specified categories plus any "other circumstances appropriate for consideration"). According to *Ritchie*, state appellate courts are reluctant to give childhood evidence much weight in their appropriateness assessment. What this

---

[4] As noted, *Ritchie* itself dealt with an overlooked Indiana Appellate Rule 7(B) argument that did not end up prejudicing that defendant. See *Ritchie*, 875 N.E.2d at 726. However, it also cited a variety of cases saying that childhood mitigation evidence receives little weight. Two of these cases also involved appellate review of sentences under state law, and not *Strickland*. See *id*. at 725, citing *Peterson v. State*, 674 N.E.2d 528, 542–43 (Ind. 1996) (applying state constitutional provision implemented in Rule 7(B)), and *Loveless v. State*, 642 N.E.2d 974, 976 (Ind. 1994) (reviewing decision of sentencing judge, but analyzing that action in context of Indiana Supreme Court's "power to modify sentences"); see also *Loveless*, 642 N.E.2d at 977, citing *Harrington v. State*, 584 N.E.2d 558, 564–65 (Ind. 1992) (asking whether sentence was "manifestly unreasonable"). We address *Coleman*, the third case cited in *Ritchie*, in note 6 below.

actually means is that appellate counsel's failure to make a Rule 7(B) argument to an Indiana appellate court will rarely be prejudicial if the argument centers on childhood mitigation evidence. That's because those claims typically fail anyway. *Ritchie* did not comment on what Indiana juries or trial judges sitting as factfinders will do in their deliberations under § 35–50–2–9(c), and (*l*), which explicitly permit the factfinder to consider such evidence and do not assign different weights to different kinds of mitigating evidence.[5]

If a state adopted a categorical rule preventing either judges or juries from considering certain kinds of mitigation evidence, that rule would be contrary to the expectation that factfinders assess the full body of mitigation evidence, as established in *Wiggins* and *Williams*. See 539 U.S. at 534–35; 529 U.S. at 398; see also *Baird*, 388 F.3d at 1115–16. If a state were to assign pre-determined weights to different kinds of mitigating evidence, that might be problematic as well, given that other Supreme Court decisions stress the need for individualized determinations in imposing serious punishments. See, e.g., *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978). But simply acknowledging the empirical fact that a state's appellate courts are generally more receptive to certain kinds of mitigating evidence than others when they make a discretionary equitable determination under state law does not raise concerns under § 2254(d)(1).

Thus the *Laux II* court should not have read *Ritchie* beyond the context of Indiana Appellate Rule 7(B), where it raises no

---

[5] Laux does not raise any ineffective assistance of appellate counsel claims in this court. The district court found those claims procedurally defaulted. See App. at 34–36.

federal law concerns, and applied it to a penalty-phase jury context where the Supreme Court has shown more concern about jury determinations of "moral culpability." See *Williams*, 529 U.S. at 398. Regardless of whether this reliance on *Ritchie* was appropriate, however, Laux has not shown that the state court's bottom-line conclusion on prejudice was unreasonable within the meaning of § 2254(d)(1).[6]

*Conclusion*

In *Williams v. Taylor*, the Supreme Court spoke of a hypothetical "run-of-the-mill state-court decision applying the correct legal rule from our cases" that rejects a prisoner's claim. 529 U.S. at 406. At bottom, that is this case. The district court was correct to deny habeas relief, and its decision is

AFFIRMED.

---

[6] One case cited in *Ritchie* came much closer to running afoul of *Williams*, but not in a way that gives pause given its peculiar circumstances. See 875 N.E.2d at 725, citing *Coleman v. State*, 741 N.E.2d 697 (Ind. 2000). *Coleman* was decided on remand from the U.S. Supreme Court in light of *Williams v. Taylor* itself, and its differences with *Williams* are explained in detail. 741 N.E.2d at 698, 700–03. The U.S. Supreme Court declined to take up *Coleman* again after this decision. *Coleman v. Indiana*, 534 U.S. 1057 (2001) (mem.) (denying petition for writ of certiorari).

Though the *Coleman* court made reference to "our previous holdings that a difficult childhood carries little mitigating weight," *Coleman*, 741 N.E.2d at 703 (by which the court presumably meant the state-law cases *Peterson* and *Loveless*, see *id*. at 700–01), the facts in *Coleman* involved "a predatory and unrepentant defendant who had two prior capital murder convictions" and who also had a less compelling childhood mitigation case than the defendant in *Williams. Id*. at 703. *Coleman*'s passing observations about the general weight given to childhood mitigation evidence are like those in *Laux II*—better left in the context of Rule 7(B), but not critical to the state court's eventual decision applying *Strickland*.